931 So.2d 297 (2006)
STATE of Louisiana
v.
Michael WEARY.
No. 2003-KA-3067.
Supreme Court of Louisiana.
April 24, 2006.
Rehearing Denied June 23, 2006.
Dissenting Opinion on Denial of Rehearing June 23, 2006.
*301 Capital Appeals Project, Jelpi Pierre Picou, Jr., Marcia Adele Widder, for applicant.
Charles C. Foti, Jr., Attorney General, Scott M. Perrilloux, District Attorney, Charlotte Hughes Herbert, Ann Morgan Trahan Griggs, Assistant District Attorneys, for appellee.
TRAYLOR, Justice
On June 7, 2000, a Livingston Parish grand jury indicted the defendant, Michael Weary, along with James Skinner and Randy Hutchinson, for the April 4, 1998 first degree murder of Eric Walber, in violation of La. R.S. 14:30. On June 18, 2001, a different Livingston Parish grand jury re-indicted the defendant, Hutchinson and Skinner, for the same offense. Trial proceeded against the defendant alone. A jury unanimously found the defendant guilty as charged. After a sentencing hearing, the same jury unanimously recommended a sentence of death after finding the following aggravating circumstances at the penalty phase: (1) that the offender was engaged in the perpetration or attempted perpetration of second degree kidnapping and armed robbery; and *302 (2) that the offense was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr.P. art. 905.4(A)(1) and (7).
The defendant now brings his direct appeal of his conviction and sentence to this court pursuant to La. Const. art. 5, § 5 D raising 38 assignments of error. For the reasons that follow, we find no merit in any of defendant's assignments and affirm defendant's conviction and sentence.

FACTS
The record shows that, after the murder was first discovered, authorities undertook an investigation to discover the perpetrator or perpetrators of the crime. As the investigation continued, authorities were unable to discover who was responsible. Not until two years later did a break come in the case. The following information was presented by the state at trial.
At approximately 9:30 p.m. on April 4, 1998, the body of a teenaged boy was discovered lying face down alongside Crisp Road in Tangipahoa Parish, Louisiana. The gravel road where the body was found was dark and there was no vehicle in the area. The body was covered in blood. Another large puddle of blood was observed at a short distance from the body where there was the imprint as of a body in the gravel. Nearby, police found a receipt for a pizza delivery to a person named Mary Ann Davis.
The autopsy of the 5'11", 190 lb. body revealed considerable injury to most of the body surfaces, but the main injury was to the victim's head and face. There were multiple lacerations on the victim's scalp and face extending down to the skull, including a palpable skull fracture. In addition, there were brush burns on the victim's face, cheeks and the point of his chin. There were lacerations on the inside of the victim's lips. Extensive lacerations and abrasions were scattered throughout the whole of the victim's body, including the victim's arms and shoulders.
As noted by the expert pathologist who conducted the autopsy, the body initially resembled an individual who had sustained a motor vehicle accident where the person was ejected from the car onto asphalt, concrete or gravel. This impression was dispelled, however, upon examination of all of the head wounds. These head wounds led the expert to believe that a homicide had occurred. There were no broken bones except for the victim's skull. The victim died at the scene due to a combination of the injuries to his head.[1]
In the early morning hours of April 5, 1998, Cherie Walber identified the body as that of her son, Eric Walber.[2] Walber, a 16-year old student at Albany High School, worked part-time as a delivery boy at Pizza Express in Albany, Louisiana, and used his red Ford Escort to make deliveries. Walber had been working the night of April 4, 1998, and his last known delivery was to Mary Ann Davis on Blahut Road, in Albany. Walber arrived at Davis' residence sometime around 8:15 p.m. and stayed for approximately five or six minutes.
Cheri Walber gave police a description of her son's car and its contents. She stated that Walber did not wear a uniform while working and that his car had no decal or other identifying feature that would have indicated he was delivering *303 pizza. Walber had been intending to leave on a ski trip the next day with friends, and his mother informed police that he would have been carrying approximately $200 in cash for the trip in his tri-fold wallet. In his car, Walber kept a policeman's nightstick for protection. Because his luggage had been sent ahead, Walber had a backpack and smaller "fanny" pack in his car packed for the trip. In his backpack, Walber had a pair of Girbaud jeans and a Tommy Hilfiger shirt. In addition, Cheri Walber told police that her son had taken a Scrabble board game, a deck of cards, a handheld electronic game and some Tommy Hilfiger cologne for the trip. She knew that Walber had borrowed a portable CD radio from a friend to take on the trip. Walber's car also contained a new set of speakers still in their packing box. Ms. Walber informed police that her son carried a wallet and wore an Albany High School ring and watch.

Initial Investigation
The initial investigation by the Tangipahoa Parish Sheriff's Office of the location where the body was found revealed long skid marks in the gravel of Crisp Road. Blood was found at the termination of the skid marks and was scattered about in different areas. One eyewitness described the road as looking like someone had spun the tires of a vehicle or was going very fast and then skidded.
The victim's car was discovered on April 8, 1998 behind an abandoned school in nearby Livingston Parish, Louisiana, and was sent to the crime lab for processing. A large blood-stained area was found in the hatchback of the vehicle and more blood was found throughout the car. All of the blood was consistent with the victim; no DNA foreign to the victim was recovered. Although several partial fingerprints or smears were found, none was suitable for identification.
The Tangipahoa Parish Sheriff's Department, and the nearby Livingston Parish Sheriff's Department which was assisting, received leads and information from several persons. Michael Weary was questioned as a possible suspect, but claimed he had been at a wedding the night of April 4, 1998. Many people were questioned in connection with this matter, but the case remained dormant for years.

Sam Scott Comes Forward
Two years later, Sam Scott, an inmate at Hunt Correctional Center, asked to speak to Livingston Parish authorities in April 2000. At that time, Scott was incarcerated on an unrelated conviction for distribution of cocaine with a five year sentence. His sentence qualified him for the boot camp program at Hunt. After completion of the boot camp program, he could have been released on intensive parole in 180 days. However, Scott's conscience was bothering him and he could neither eat nor sleep; consequently, he asked the boot camp program administrator to contact Livingston Parish authorities.
Prior to his coming forward, the name of Sam Scott had never come up in the investigation of Walber's murder by officials in either Tangipahoa Parish or Livingston Parish. When Scott met with the Livingston Parish detectives, he gave several differing accounts of Walber's murder and of his involvement, as well as the involvement of neighborhood friends whom he had known for years. Ultimately, Scott gave four recorded statements to police[3] and *304 one unrecorded statement,[4] each differing in certain respects. However, in each of his statements, Scott implicated the defendant, Randy Hutchinson, James Skinner, Shadrick Reed and Darrell Hampton.
Scott testified at the defendant's trial that on the evening of April 4, 1998, after dark, the defendant, Scott, Hampton, Reed, Hutchinson and others were standing in front of the home of an individual known as "Popeye" who lived near Hutchinson. The defendant was wearing a pinkish dress shirt and slacks. Since this was not his normal type of clothing, Scott believed the defendant had come from some event or special occasion earlier in the evening. The men were passing the time gambling by shooting dice.
When the defendant lost all of his money, Scott heard him say that he needed to obtain more money and that he was going to rob someone. At that time, a red car which was unfamiliar to Scott, came from the direction of Highway 43 onto McCarroll Street where the men were. Scott said they could not see who was in the car but the defendant said that if the car passed by again, he would rob whoever was in the car.
Approximately 15-20 minutes later, as Walber driving the red car was returning from his pizza delivery, he drove back by the group of men. Hutchinson flagged Walber down by standing in front of the car on the street. The defendant ran up to the driver's side and hit Walber three times in the face through the open driver's side window. The defendant and Hutchinson opened the driver's door and pulled Walber out of the car and started beating Walber in the face outside of the car. The defendant took a black wallet and ring from the victim. Scott described the victim as wearing blue jean shorts.
The defendant told Scott, Reed, and Hampton to take a ride with him to get some marijuana. Hutchinson pushed Walber through the passenger door and into the hatchback of the car. With the defendant driving, Scott in the front passenger seat and Hampton, Hutchinson and Reed in the back seat, the men drove approximately 2-3 minutes and parked the car on a gravel road off of nearby Presbyterian Road in Springfield, Louisiana, near a church and a graveyard. According to Scott, there was no discussion where they would go as the defendant, who was driving, simply stopped at this location.
The men exited the vehicle and Hutchinson pulled the victim from the hatchback onto the little gravel road. Hutchinson began to beat Walber with a black, shiny stick that Scott had not seen before the men got into the car. The defendant hit the victim in the face with his hands while Scott, Hampton and Reed stood by. The beating continued for 15-20 minutes, with the victim ultimately on his knees in front of the car's headlights, until the defendant stated that it was time to go.
The men re-entered the vehicle with the defendant driving, Scott in the passenger seat and Hampton, Hutchinson and Reed in the backseat. Once again Hutchinson had pushed the victim into the hatchback. Scott stated that the victim was making moaning sounds but that he could not understand what he was trying to say. Once again, there was no discussion as to their destination. The defendant drove on Highway 43 going back toward McCarroll Street.
*305 About 2-3 minutes later, the defendant stopped the car in an area of an abandoned house off of Highway 43. The victim was again removed from the car by Hutchinson through the passenger side and beaten with the stick. The victim, who was bleeding and lying on the ground, attempted to crawl away but was unable to do so because Hutchinson prevented his escape. None of the other men attempted to help the victim but Hampton stated that he was going to leave. The defendant told Hampton that no one was going to leave.
After 15-20 minutes, the defendant announced they were leaving and the men returned to the car. With the defendant driving, the men traveled farther down Highway 43 toward Albany. The defendant saw a car he recognized and flashed his lights. The defendant then pulled the red car into the parking lot of a convenience store called The Potluck.
Eric Charles Brown was driving the other vehicle with James Skinner as his passenger. Brown turned around and joined the defendant at The Potluck after the defendant flashed his lights at him. The defendant left the car and walked up to the driver's side of the other vehicle to speak to Brown. Skinner got out of Brown's car and approached the red car to ask Scott and Hampton if they had any marijuana. When they told him they did not, Skinner walked back to Brown's car and spoke to the defendant. Scott did not hear the defendant's conversation with either Brown or Skinner. While the car was parked, Hampton leaned his head out and asked Brown for a ride home; Brown refused.
After their conversation was completed, the defendant and Skinner walked back to the red car. With Skinner driving, the defendant moved to the front passenger seat with Scott sitting on the console between them. Hampton was seated in the backseat behind the driver and Reed was in the backseat behind the front passenger. Hutchinson was in the hatchback with the victim. According to Scott, they were "like sardines in a can."
Skinner drove the car to the gymnasium of the abandoned Springfield Junior High School. Brown followed in his own car. At that location, everyone got out of the vehicles. Hutchinson removed the victim through the passenger door.
Because Brown had refused to give Hampton a ride home, Brown and Hampton got into a fight. Brown punched Hampton in the face between the eyes above his nose three times.[5] Meanwhile, Hutchinson continued to beat Walber on the ground in front of Walber's car. The defendant and Skinner talked while Reed and Scott stood there.
After Brown and Hampton's fistfight, the men all returned to their vehicles and sat in the same positions as before and drove off again. Instead of trying to push the victim into the car through the passenger door, however, Hutchinson put the victim into the hatchback through the hatchback door.
Skinner drove the red car to Crisp Road in Tangipahoa Parish. According to Scott, all of the prior activity had occurred at locations in Livingston Parish. The badly beaten Walber was taken out of the hatchback by Hutchinson. All of the men exited their vehicles. Brown stayed at that location for a few minutes but left in his own car after telling Skinner he would see him later. According to Scott, the victim *306 could not say anything that anyone could understand.
After Brown left, Hutchinson and Weary took the victim to the middle of the gravel road, each holding up one of the victim's sides. Skinner got back in the car and drove the car a little way up the road and revved the engine. Accelerating, Skinner drove the car toward the men in the street. The defendant and Hutchinson let go of the victim and Skinner hit the victim with the car. Skinner turned the car around and ran over the victim again, who was now lying on the ground. Skinner then backed up over the victim's body. According to Scott, the victim did not move after being hit by the car. The defendant and Skinner moved the victim's body to the side of the road, leaving the victim lying face down.
The men returned to Springfield to Melvin Tillman's house. There, Scott saw Tillman and Ricky Color from a distance. Scott, Reed and Hampton got out of the car and Scott walked home. Scott admitted he had smoked marijuana that night.
While in the car, Scott saw a Scrabble board game, a hand-held electronic poker game, a deck of cards and a portable CD player. Scott saw new car speakers, a school backpack and a smaller travel bag. In the backpack were Girbaud blue jeans and a Tommy Hilfiger shirt. According to Scott, Hutchinson took the shirt and the defendant had the victim's school ring. In addition, the defendant took the money from the victim's tri-fold black wallet. Scott maintained that he did not receive anything from the victim's car or person.
Scott claims he saw the red car the next day driven by the defendant with Hampton as passenger, but claims he did not talk to them. A day or so after that, Scott and his passenger Robert Brewer saw the red car again being driven by the defendant. At that time, Scott stopped his car and Brewer talked with the defendant.
Scott admitted he did not tell the authorities the whole story the first time, nor on the subsequent times that he spoke with them. In fact, in his first statement, he did not even admit to being present but told authorities that someone had told him the facts. At the time of the defendant's trial, Scott was serving his five year sentence, as he had not been able to participate in the boot camp program due to the need for his presence in Livingston Parish during the investigation of this case. In exchange for his testimony, Scott was offered a deal to plead to manslaughter for his role in the Walber murder and to receive a sentence of 10 years, to be served concurrently with the sentence he was presently serving.

Eric Charles Brown's Testimony
Eric Charles Brown testified that he and James Skinner were hanging out, selling drugs and drinking on the evening of April 4, 1998. After receiving a call to deliver some drugs, Brown and Skinner drove in Brown's car, which was well-known in the neighborhood. Brown, the driver, saw someone blinking his lights at him as he drove down Highway 43 and pulled into the parking lot of The Potluck convenience store. The defendant, who had blinked his lights at Brown, got out of the small red car he was driving and came over to talk to Brown. Brown could see other people in the red car but had never seen the car before. The defendant asked Brown if Brown had a gun. When Brown replied that he did not, the defendant asked Skinner the same question. Skinner replied that he had a gun on him. Skinner and the defendant then walked to the back of Brown's vehicle to talk.
According to Brown, and contrary to Scott's assertion, Skinner got back in Brown's car and told Brown to follow the *307 defendant after the defendant and Skinner finished their conversation. Driving his car, Brown followed the defendant driving the little red car to Presbyterian Road. When they exited the red car, Brown observed Hampton, Hutchinson, Reed, Scott, and the defendant, all of whom were well known to him. In addition, Brown saw "a little white guy" with them.
Hampton asked Brown for a ride home but the defendant told Brown to refuse. Brown knew the defendant better, so he told Hampton he would not give him a ride. Brown got into a fight with Hampton during which he punched Hampton in the face two or three times. Brown was not paying attention to anything else that was occurring. He was at this location only 5-6 minutes, because the defendant told Brown the defendant was trying to take care of some business and that they should all leave.
Brown did not know what the defendant meant by this statement, but got back in his car with Skinner and followed the defendant again. According to Brown, the defendant was in charge of what was occurring. Brown told Skinner that he did not want to be involved with whatever was going on. Skinner told Brown he wanted to get in the car with the defendant because the defendant had borrowed his gun. Brown then flicked his lights at the defendant, who was preceding him, and the defendant turned onto Crisp Road.
As Skinner exited Brown's vehicle, Brown asked Skinner if he was going to stay with the defendant and the others. Skinner said that he was. Brown saw the men getting out of the red car, including the victim being removed from the hatchback. Brown had eye contact with the victim and turned his head, not saying anything.
Brown left the area and drove to Springfield to complete his drug transaction. He saw the red car again at a stop sign as he was returning, but did not stop. He later heard on television that a young man was killed and realized that the victim was the young man he had seen with his friends and that the murder must have occurred after he left. However, he did not say anything to authorities at that time.
A few days after the murder, the defendant asked Brown for $300 because he had "to blaze for a minute." Brown understood this to mean that the defendant was going to leave town.
Brown was in jail at the time he testified at the defendant's trial. He had a 1991 prior drug conviction and a 1999 conviction for attempted distribution of cocaine, for which he was serving a 15 year sentence. He admitted he did not talk to police about what he knew until he was arrested on his current charges. Brown admitted that his testimony at trial was not the same story that he initially told police. He claimed that he received no deal in exchange for his testimony, although he acknowledged that his sentencing exposure was much greater for the two counts he had been facing, that the sentences could have been set to run consecutively, and that he could have been billed as an habitual offender and was not. Additionally, Brown admitted he was arrested for aggravated kidnapping, car-jacking and armed robbery in connection with Walber's murder, but that he was not charged with any of these offenses. He also acknowledged that he was caught with a handcuff key while in prison but was not prosecuted for that offense.

Melvin Tillman's Testimony
Melvin Tillman was one of the persons who gave authorities information during their initial investigation. Tillman contacted Livingston Parish authorities when it became known that they were looking for *308 information on the victim's red car. Tillman told Detective Kearney Foster of the Livingston Parish Sheriff's Department that on the evening of April 4, 1998, he and Ricky Color were together smoking crack cocaine. He claimed that he was no longer under the effect of that drug when he saw the defendant, known to him as Mike-Mike, in a small reddish car. Tillman saw the defendant on McCarroll Road approximately 50 yards from Hutchinson's house. He described that Hampton was driving the car with someone named Terrell, now deceased, and Reed was sitting in the passenger side. Tillman claimed that the defendant was sitting in the back seat with Larry Norman, Dartania Tillman and another individual he did not know.
Tillman noticed the car was covered with blood and that the passenger side light was hanging out. When Tillman commented on the condition of the car, the occupants told him they had hit a dog and had to run over it a few times in order to kill it. Subsequently, the defendant left the car and asked Tillman for a ride to Albany. The defendant also asked Tillman if he wanted to buy an Albany High School class ring, which Tillman declined.
Either the next night or a few nights later, Tillman again saw the red car at his house. This time, Reed and Hampton were in the car. Tillman told them they needed to do something about all of the blood in the car because the car was starting to smell. Tillman has prior convictions for both possession and distribution of drugs, as well as misdemeanor theft.

Robert Brewer's Testimony
Robert Brewer knew all of the individuals named by Scott and Brown for many years. Brewer claimed he saw the little red car on April 4, 1998 at approximately 7-7:30 p.m.[6] He saw the car later when he was out riding with Scott. When he saw the defendant driving the red car, he asked Scott what the defendant was doing with the car and Scott said he did not know. Subsequently, the defendant asked Brewer if he wanted to buy some brand new speakers. Brewer saw the defendant with the red car again a few days later.
Brewer had a prior 1989 conviction for theft and a 1994 conviction for distribution of cocaine. Brewer indicated that he and Scott used to "hang together" and both sold drugs, as did Melvin Tillman.

Jeffrey Ashton's Testimony
On April 4, 1998, Jeffrey Ashton was 10 years old and lived close to McCarroll Road. At approximately 11:20 p.m., he was walking home from a music program at the church across the street from his family's trailer when he heard footsteps. He ran and hid under his family's trailer. From that vantage point, he saw the defendant, Hutchinson and Hampton, whom he knew from the neighborhood. Ashton watched as the defendant threw something silver into a ditch. He then saw the three men get back into a red car. The next day, Ashton rode his bike to the ditch and found a Tommy Hilfiger cologne bottle. Ashton saw the car frequently the next day being driven by Hutchinson, Reed, the defendant, and someone else whom Ashton did not know. Ashton never saw Scott in the red car. Later that afternoon, he saw someone throw a black triangle or square from the car. Although he searched for that object, he did not find it.[7]
*309 Ashton told a teacher about what he had seen but claimed that someone else had told him the information. He initially talked to police but did not tell them what he knew. Not until Ashton was under house arrest for a juvenile offense of simple battery did he tell the police what he had seen. Ashton admitted that he plays with Scott's brother in the neighborhood where they all live.

Defendant's Alibi Testimony
The defendant claimed that he had no involvement with Walber's murder, asserting that he was out of town in Baton Rouge at a wedding at the time that the murder occurred. At his trial, the defendant presented the testimony of his girlfriend, Renarda Dominick, her aunt, Darlene Johnson, and her sister, Kimberly Dominick Armstrong, to state that the defendant was attending a wedding reception until 9 or 9:30 p.m. in Baton Rouge. According to these witnesses, the defendant did not return to Springfield until well after 10 or 10:30 p.m., after Walber's body had been discovered.
However, the state presented evidence that the warden of the Tangipahoa Parish jail and two other deputies overheard the defendant as he was speaking to his father after he had been arrested and charged. Weary was overheard to say that he did not understand why he was in jail for the murder, as he was just an innocent bystander. Thus, Weary placed himself at the scene of the crime.

State's Rebuttal Testimony
To rebut the defendant's evidence of alibi, the state presented the testimony of Rene' Helm, the bride at whose wedding the defendant was in attendance on April 4, 1998. According to Ms. Helm, her wedding began at 4 p.m. that afternoon and her reception began at 6 p.m. Although she and her husband rented the reception hall from 6 to 9 p.m., they did not use the hall for the entire time. She and her husband were the last to leave the reception between 8:30 p.m. and 8:45 p.m. While she had seen the defendant at her reception, she did not see him or his girlfriend when she left, so assumed he had left earlier.
After considering all of the evidence presented, the jury unanimously found the defendant guilty of first degree murder.

Penalty Phase Evidence
The following day, the trial court conducted the capital sentencing hearing. The state first reintroduced all of its evidence from the guilt phase. Next, the state presented evidence of the defendant's criminal history, which included a previous guilty plea to simple robbery and a conviction for possession of cocaine with intent to distribute. The state also called several witnesses, including George Walber, the victim's father; Luke Walber, the victim's brother; and Cheri Walber, the victim's mother, to testify about Eric Walber and as to the impact of his death on their family.
The defendant testified on his own behalf during the penalty phase. He claimed he was innocent of the murder of Eric Walber and that he was at the wedding in Baton Rouge at the time Walber's murder was committed. The defense presented the testimony of the defendant's father, aunt, and brother to the jury. The defense also presented the testimony of the defendant's girlfriend, with whom he has two children, and her mother and her sister to testify what the impact would be on the defendant's children if the defendant were to be sentenced to death. The defendant's children were brought into the courtroom for the jury to see.
*310 Following the penalty phase, the jury unanimously recommended that the defendant be sentenced to death, after finding that the murder was committed in an especially atrocious, heinous or cruel manner and also that the murder was committed during the perpetration or attempted perpetration of an armed robbery and a second degree kidnapping. Thereafter, the trial court formally sentenced the defendant to death by lethal injection.
The defendant now appeals his conviction and sentence urging 38 assignments of error.[8]

LAW AND DISCUSSION

Assignments of Error 1-4
The defendant claims that there was insufficient evidence to support his conviction and sentence. Specifically, the defendant argues that the evidence presented through the testimony of the witnesses contains contradictions and implausibilities which render the testimony inherently unreliable. The defendant points to the fact that no physical evidence links him to the crime, and that his conviction rests entirely on the testimony of Sam Scott, an admitted liar, who gave six versions of the events of Walber's murder. The defense argues that Scott's testimony was directly contradicted on material points by Brown, Tillman and Brewer. In addition, the pretrial statements of Brown, Tillman and Ashton contradict their own trial statements. Finally, the defendant claims that the rebuttal witness, rather than rebutting his defense of alibi, actually corroborated that he was at an out of town wedding during the window of time that Walber's murder could have occurred, from 8:20 p.m. when Walber delivered a pizza to Davis's house until 9:30 p.m. when Walber's body was discovered.
In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; see State v. Neal, XXXX-XXXX p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory test of La. R.S. 15:438 "works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." Neal, XXXX-XXXX p. 9, 796 So.2d at 657.
To convict the defendant of first degree murder, the prosecution was required to prove that the defendant specifically intended to kill or to inflict great bodily harm on the victim during the perpetration or attempted perpetration of certain felonies. La. R.S. 14:30(A)(1).[9] *311 The state bore the burden to prove these elements, and to prove the identity of the defendant as the perpetrator. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); Neal, XXXX-XXXX p. 10, 796 So.2d at 657. In addition, "[a]s a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." Neal, XXXX-XXXX p. 11, 796 So.2d at 658; State v. Smith, 430 So.2d 31, 45 (La.1983). A positive identification by only one witness is sufficient to support a conviction. Neal, XXXX-XXXX p. 11, 796 So.2d at 658; State v. Mussall, 523 So.2d 1305, 1311 (La.1988). We find that the state bore that burden by presenting evidence against the defendant which established that he specifically intended to and did in fact kill Eric Walber during the perpetration of second degree kidnapping.
Second degree kidnapping is defined in pertinent part as the forcible seizing and carrying of any person from one place to another where the victim is physically injured. La. R.S. 14:44.1(A)(3), (B)(1). The state presented evidence from which a reasonable juror could find beyond a reasonable doubt that the defendant had the specific intent to kill Walber or inflict great bodily harm on him while engaged in a series of beatings during which the defendant and others forcibly carried Walber from place to place.
The evidence established that the defendant rushed at Walber's red car after Hutchinson flagged the car down. The defendant struck Walber three times in the face before pulling Walber out of his car with Hutchinson's assistance. The defendant and Hutchinson then beat Walber outside of his car until the defendant, clearly the person in charge of events, ordered the other men with whom he was with that evening into Walber's vehicle. From this initial contact, Walber was forcibly carried from place to place, each time being beaten by Hutchinson with a large stick, sometimes joined by the defendant using his fists, until the men brought Walber to Crisp Road.
At Crisp Road, the defendant and Hutchinson held Walber's beaten body in the roadway between them and then released him so that Skinner could hit Walber with Walber's car. The jury could reasonably have inferred that the defendant had the specific intent to kill or inflict great bodily harm on Walber by holding him in the middle of a roadway and releasing Walber in front of a speeding automobile. Scott's identification of the defendant, a person he had known for many years, as the perpetrator of these actions, was sufficient to prove that the defendant was the individual who committed these crimes.
The jury which found the defendant guilty of first degree murder was fully informed of the inconsistencies between Scott's trial testimony and his previous statements to authorities. In fact, nearly the entire cross-examination of Scott by defense counsel pointed out the inconsistencies. In addition, the defense raised the areas of inconsistency between Scott and the other witnesses. The defense additionally elicited testimony regarding the other leads investigated by the police and other possible perpetrators. However, "[t]he trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the *312 testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion `only to the extent necessary to guarantee the fundamental protection of due process of law.'" State v. Higgins, XXXX-XXXX p. 17 (La.4/1/05), 898 So.2d 1219, 1232, cert. denied, ___ U.S. ___, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005), citing Mussall, 523 So.2d at 1310. Although we recognize that there are inconsistencies in the witnesses's testimonies, we find sufficient evidence for the jury to have found the necessary elements of first degree murder proved beyond a reasonable doubt.
We also note that the evidence supported a jury finding that the defendant had the specific intent to kill Walber while engaged in the perpetration of a simple robbery, one of the other enumerated felonies which support a finding of first degree murder pursuant to La. R.S. 14:30(A)(1). "Simple robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon." La. R.S. 14:65. The jury heard evidence that the defendant stole Walber's money, ring, vehicle and specific items in Walber's vehicle, through the use of force.[10]
The defendant asserts that even if the evidence is sufficient to support the jury's conviction, the evidence was too insubstantial to support the jury's sentence of death.[11] La.C.Cr.P. art. 905.3 provides that "[a] sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed." La.C.Cr.P. art. 905.7 requires that the jury specify the aggravating circumstance or circumstances found unanimously to exist. In this case, the jury found that death was an appropriate punishment after finding the existence of two aggravating circumstances: (1) that the offender was engaged in the perpetration or attempted perpetration of a second degree kidnapping and an armed robbery; and (2) the offense was committed in an especially heinous, atrocious and cruel manner. See La.C.Cr.P. art. 905.4(A)(1) and (7).[12]
*313 As previously stated, the evidence presented at trial was sufficient to prove beyond a reasonable doubt that the murder of Eric Walber was committed during the perpetration of a second degree kidnapping. Finding the evidence sufficient to support the jury's determination that the murder was committed during a second degree kidnapping, it is unnecessary for us to review the jury's determination that the murder was also committed during the perpetration or attempted perpetration of an armed robbery. Armed robbery is defined in La. R.S. 14:64 as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." Although there was testimony suggesting that the defendant possessed or obtained a weapon during the commission of the crime, and pretermitting the question of whether the policeman's nightstick or Walber's vehicle could constitute a dangerous weapon pursuant to La. R.S. 14:2(3) under these circumstances, a finding that the evidence was insufficient to support that an armed robbery occurred does not change our analysis of this assignment of error.
As previously stated, the evidence supports a finding that the murder was committed during a simple robbery. Simple robbery, a lesser included offense of armed robbery, supports the finding of an aggravating circumstance under La. C.Cr.P. art. 905.4(A)(1), as well. The fact that we could find evidence sufficient to support the conclusion that the murder occurred during the perpetration or attempted perpetration of a simple robbery, rather than armed robbery as found by the jury, does not inject an arbitrary factor into this determination. State v. Manning, XXXX-XXXX p. 65-67 (La.10/19/04), 885 So.2d 1044, 1101-1102, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005); discussing Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The evidence supporting a simple robbery must, necessarily, have been found by the jury in their finding that an armed robbery occurred. In addition, our law is clear that the invalidation of one aggravating circumstance does not require setting aside a capital sentencing verdict which rests in part on other valid aggravating circumstances found by the jury. Manning, XXXX-XXXX p. 71, 885 So.2d at 1106.
Finally, we find there was sufficient evidence to support the jury's finding that the murder was committed in an especially atrocious, heinous or cruel manner. This court has given the statutory aggravating circumstance of heinousness a narrow construction, requiring "that to be valid there must exist elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death." Manning, XXXX-XXXX p. 67-68, 885 So.2d at 1103; see also State v. Brogdon, 457 So.2d 616, 630 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). "Torture requires evidence of serious physical abuse of the victim before death." Manning, XXXX-XXXX p. 69, 885 So.2d at 1104; State v. Sonnier, 402 So.2d 650, 659 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). In addition, "[t]his Court has also held that the murder must be one in which the death was particularly painful and one carried out in an inhumane manner." *314 Manning, XXXX-XXXX p. 68, 885 So.2d at 1103. A victim's "awareness of impending doom" is relevant to a finding of heinousness. Manning, XXXX-XXXX p. 70, 885 So.2d at 1104.
Dr. Fraser MacKenzie, an expert pathologist, performed the autopsy and testified about Eric Walber's injuries. Dr. MacKenzie found considerable injury to most of the body surfaces with the main area of injury being to Walber's head and face.[13] In addition to deep lacerations on his scalp and the top of Walber's head, there were incise type wounds on his face.[14] All of the head wounds extended down to Walber's skull.[15] Walber also sustained a palpable fracture of his skull, i.e. one which could be felt with the fingers.[16] Dr. MacKenzie testified that Walber's head wounds could have occurred within a 15, 30 or even 45 minute time period.[17] He stated that one of the head wounds could have been a fatal blow if the wound was left unattended.[18] In addition, the expert pathologist testified that Walber could have been moved about and beaten over a period of time and still been alive.[19]
The autopsy photographs which were introduced in evidence show extensive cuts and abrasions to most of Walber's body. Moreover, Dr. MacKenzie stated that there were further injuries to Walber which were not depicted on the autopsy photos.[20] Walber's facial features were so contorted from the beating he received that his mother did not recognize him to identify his body.
These physical findings were consistent with Scott's testimony detailing near continuous, vicious beatings of Walber as he was carried from place to place. Scott testified that Walber attempted to escape,[21] and that he moaned throughout his ordeal.[22] Thus, the evidence establishes that Walber was aware of what was happening to him and was suffering pain. Scott testified that Walber did not make any more sounds after he was hit with his own car.[23] Dr. MacKenzie testified that Walber died on Crisp Road.[24]
We find the evidence sufficient for a rational juror to find beyond a reasonable doubt that the defendant subjected Eric Walber to the pitiless infliction of unnecessary pain prior to Walber's death. The serious physical abuse which Walber suffered amounts to torture under our law. Dr. MacKenzie testified that Walber's head injuries were serious enough to be fatal blows if left unattended, however, Walber did not die immediately but suffered until he was forcibly carried to Crisp Road. Walber's death, coming after being hit and run over by a car three times, was a particularly painful way in which to die. We find that the defendant carried out Walber's death in a particularly inhumane manner and we hold there was sufficient evidence to support beyond a reasonable doubt the jury's finding as to this aggravating circumstance.

*315 Assignments of Error 5-7

The defendant asserts that the trial court erred in denying the defense's pretrial motion to change venue, arguing that a fair and impartial jury could not be seated in Livingston Parish due to pretrial publicity. The record on appeal does not contain a written motion for change of venue. However, appellate defense counsel attaches to the appellate brief a motion for change of venue filed by the defendant's co-defendant, James Skinner.[25] The defendant, Skinner and Hutchinson, indicted together, participated in the same pre-trial discovery until the cases were severed for trial. Written motions by co-defendants are presumed to have been made on behalf of all defendants unless the contrary appears. La.C.Cr.P. art. 842; State v. LaCaze, XXXX-XXXX p. 21 n. 37(La.1/25/02), 824 So.2d 1063, 1079 n. 37, cert. denied, 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002).
The trial court in this matter clearly presumed that the defendant sought to change the venue of his trial based on the written motion filed by his then-co-defendant, Skinner. Prior to juror voir dire, defense counsel raised the issue of his objection to venue. The trial judge stated that the motion to change venue had previously been filed and that he would make a ruling on the motion during the course of the voir dire proceeding.[26] At that time, defense counsel mentioned three articles from local newspapers which were published either the weekend before the Tuesday start of jury selection, or the day jury selection began, in support of the motion to change venue.[27] The trial judge indicated that, if necessary, he would conduct individual voir dire of the prospective jurors.[28]
The record reveals that the trial court, in fact, conducted individual voir dire regarding pre-trial publicity. The trial judge, prosecutor and defense counsel actively participated in questioning the prospective jurors specifically about what they had heard and seen about the case, where they had heard or seen the information, when they had heard or seen the information, and whether the information they had heard or seen caused them to form an opinion about the guilt of the defendant. After each prospective juror was individually questioned, the trial judge entertained challenges from counsel on the issue of whether the prospective juror was able to serve impartially considering their exposure to pretrial publicity. After a sufficient number of prospective jurors had been "pre-cleared" in this manner, and prior to further voir dire questioning on other matters, the trial judge asked whether there were any motions to put on the record.
Defense counsel again raised the motion for change of venue:
Defense counsel: Your Honor, there are a couple of things and one of the things is to finish up on the change of venue motion since we have gone through the panel. We have not gotten down to, you know, individual voir dire as far as the final selection is concerned, but I think we have got in a position of where the court can make some determination about pretrial publicity, et cetera.
Court: Well, certainly, on the issue  and as I recall, the basis for the change of venue was the extensive *316 pretrial publicity and the talk in the community and things of that nature.
Defense counsel: Yes, sir.
Court: I am satisfied having gone this far and having pre-cleared by my count some 55 potential jurors, even though a lot of them indicated they had either read or heard something about the case, the court is satisfied that these jurors nevertheless can still serve as an impartial juror and consider all of the evidence and law in this case. So, the motion to change of venue on the basis of pretrial publicity is denied.[29]
After the denial of the motion, defense counsel entered into the record copies of the three newspaper articles previously described and a videotape recording of the two America's Most Wanted television programs which were aired concerning this matter.[30]
A defendant is constitutionally guaranteed an impartial jury and a fair trial. La. Const. art. 1, § 16. To accomplish this end, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue. Manning, XXXX-XXXX p. 6, 885 So.2d at 1061; State v. Frank, XXXX-XXXX p. 11 (La.1/17/01), 803 So.2d 1, 12; State v. Connolly, XXXX-XXXX p. 4-5 (La.7/1/97), 700 So.2d 810, 814. Absent unusual circumstances, the defendant bears the burden of showing actual prejudice. Manning, XXXX-XXXX p. 7, 885 So.2d at 1061; State v. Hoffman, XXXX-XXXX p. 5 (La.4/11/00), 768 So.2d 542, 552, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
La.C.Cr.P. art. 622 provides the grounds for a change of venue:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
"Whether the defendant has made the requisite showing of actual prejudice is a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." Hoffman, XXXX-XXXX p. 5, 768 So.2d at 552 (internal quotations omitted). Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Manning, *317 XXXX-XXXX p. 7-8, 885 So.2d at 1061-1062; Hoffman, XXXX-XXXX p. 6, 768 So.2d at 553; State v. Bell, 315 So.2d 307, 311 (La.1975).
The first newspaper article, published Sunday, February 24, 2002, in THE LIVINGSTON PARISH NEWS, was entitled "Trial opens Tuesday for first defendant in Walber murder." The front page article informed the reader that the defendant's trial was to begin on Tuesday of that week, what the defendant was charged with, the names of other individuals also charged in connection with the incident and the fact that the charges were the result of a two-year investigation. The article related the identity of the victim and that the victim had been found dead on Crisp Road. The article stated that police had concluded that the victim had been robbed and carjacked before being run over with his own car. The article mentioned Cheri Walber's attempts to find the persons responsible on nationwide television airings of "America's Most Wanted" and the "Leeza" show. The article includes information from the district attorney that the death penalty was being sought and that the trial was expected to last about ten days.[31]
The second newspaper article was published on Tuesday, February 26, 2002, the day that jury selection began, in THE ADVOCATE, a Baton Rouge, Louisiana newspaper. This article was entitled "Murder trial starts today in Albany teen's slaying" and contained similar factual information regarding the victim, the fact that the case had drawn nationwide media attention as investigators sought leads for two years and the fact that authorities had gained information in 2000 which resulted in arrests in the case. The delay in the investigation was also attributed to the fact that the case crossed jurisdictional bounds in that Walber was abducted in Livingston Parish and killed in Tangipahoa Parish. The article included information attributed to the district attorney that the death penalty was being sought against the defendant, who appeared to be the ringleader in the killing. In addition, the district attorney was referenced as expecting the case to last eight to ten days, with jury selection consuming the first three or four days. Other persons charged in connection with the case were listed and the charges brought against them were indicated in the article.[32]
The third newspaper article was published on Sunday, February 24, 2002, in THE SUNDAY STAR, a Hammond, Louisiana newspaper.[33] The front page article was entitled "Jury choice to begin in Walber case." The article informed the reader that jury selection was to begin on Tuesday in this case and that the defendant was one of six suspects arrested in connection with the killing of the victim. Weary was described as being from Oakland, California, and stated that he was in Winnfield Parish jail on a probation violation at the time of his June 2000 arrest. The article described that the defendant, who lived in Albany, Louisiana at the time of the murder, was brought to Hammond for questioning from California a month after the murder. The article related that Weary had been released after that questioning based on his alibi that he was at a Baton Rouge wedding on the night of the *318 murder.[34]
This third article also described the facts of Walber's disappearance and discovery of his body and its extensive injuries, as well as investigators' conclusions that he had been run over by his own car after being carjacked. The article described the damage to Walber's car and the fact that blood had been found on several locations on and within the vehicle. The article named other persons charged in connection with the crime and the fact that one of the men arrested, Eric Brown, was reported to be assisting the prosecution. The article reported that the district attorney declined to comment on the impending proceedings but did say that jury selection could take up to three to five days.[35]
Our review of the first segment of "America's Most Wanted" on the videotape shows that the show was broadcast on television prior to any arrests in this matter and described the victim, the location and condition of his body when found, the condition of the victim's car and the fact that there was no information or leads with regard to what had happened. The second segment of the television show on the videotape repeated the information from the original show but included the information that six individuals had been arrested in connection with the crime. The names of those individuals were not presented, but pictures of the six men arrested were briefly shown.[36]
We will now apply the pertinent factors to determine whether actual prejudice existed. We find that the questioning of prospective jurors revealed that there had been newspaper articles and television coverage of the crime when the victim's body was first discovered on April 4, 1998. The case was again in the news in April, 2000, when arrests were made in the case. Finally, newspaper articles were published and television coverage was broadcast again as the defendant's trial neared on February 26, 2002. Most of the venire was aware of the crime and of some specific facts about either the victim or how the crime allegedly occurred either through these media sources or through general community knowledge.
However, the defendant cannot show entitlement to a change of venue solely by evidence of community knowledge. "A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail merely by showing a general level of public awareness about the crime." Manning, XXXX-XXXX p. 9, 885 So.2d at 1063; Frank, XXXX-XXXX p. 14, 803 So.2d at 15. In order to have his trial moved to another parish, a defendant must show the extent of prejudice against him in the minds of the community as a result of public knowledge or familiarity with the facts of the case or exposure to the case before trial. Frank, XXXX-XXXX p. 14, 803 So.2d at 15 (emphasis added).
Our review of the newspaper articles and videotape of the television program entered in evidence, combined with the information disclosed by prospective jurors during voir dire, shows us that the media coverage, while extensive, was primarily factual in nature regarding the victim, the discovery of the victim's vehicle and body and the investigation by police. The published information included the arrests made and the names of the alleged co-perpetrators. In one of the newspaper *319 articles admitted in evidence, information regarding the defendant's criminal history and his alibi was disclosed, although the trial judge did not believe that any of the potential jurors saw that article.
Although involvement in publicity by government officials may have been greater in the earlier part of the investigation when they were soliciting information and leads in the case, there was nothing in that media coverage which we find could have prejudiced the community against the defendant because authorities had no information at that time other than the factual information regarding the discovery of Walber's body and car. Not until Scott came forward two years later was there any information which connected the defendant to the crime. At that time, the media reported on the arrests made. Immediately prior to trial, one newspaper article attributed a comment to the district attorney that the defendant was considered the "ringleader" of the persons arrested.
The trial of this matter occurred nearly four years from the date the crime was committed. News reports and articles about the case were disseminated in the community at the time the crime was discovered, when arrests were made and immediately prior to and during trial. During the voir dire questioning, the trial judge repeatedly admonished prospective jurors to avoid reading the newspaper or to watch television coverage of the case.
Appellate defense counsel claims that a fair trial was impossible in Livingston Parish because there is little minority presence there, considering this was the trial of an African-American defendant accused of the first degree murder of a white victim. The defense concedes that it is unaware of any other community events which would reflect or affect the attitude of the community or individual jurors toward the defendant. However, the defense also contends that the prospective jurors violated the trial judge's orders not to discuss this case and talked to each other about what they knew about the case throughout voir dire.
The voir dire record shows that most of the prospective jurors had never heard the name of the defendant and had not heard of a connection between him and the case. This court has rejected the argument that "smaller, rural parishes are improper venues for capital cases as a result of the local population's familiarity with the offense." Manning, XXXX-XXXX p. 13, 885 So.2d at 1065; citing State v. Clark, XXXX-XXXX p. 25 (La.6/27/03), 851 So.2d 1055, 1075, cert. denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004). Although appellate defense counsel raises racial considerations as an impediment to a fair trial, the prospective jurors' voir dire responses fail to show any indication that race was an issue that the community considered in this matter. See Hoffman, XXXX-XXXX p. 8, 768 So.2d at 554.[37]
*320 Although the violent kidnapping, robbery and murder of an area high school student was a sad and tragic event in this rural community, the crime was not, unfortunately, a unique one in today's world. The record discloses that the trial judge, prosecutor and defense counsel questioned each prospective juror individually "in painstaking detail concerning his or her knowledge of the instant case, and opinions concerning the defendant's guilt or innocence." Hoffman, XXXX-XXXX p. 9, 768 So.2d at 555. Potential jurors who expressed that they had formed an opinion against the defendant based on publicity were excused for cause unless they expressed to the court that they would be able to put those feelings aside and fairly evaluate whatever evidence was presented at trial. Frank, XXXX-XXXX p. 17, 803 So.2d at 17. Although some prospective jurors were exposed to further pretrial publicity through word of mouth, or of others' opinions regarding the case, during the voir dire process, the individual questioning disclosed what information was received. While the record reveals most prospective jurors possessed a general knowledge of the case, defendant fails to demonstrate the existence of an overriding prejudice against him in the community that prevented him from receiving a fair trial. In the present case, we find after a thorough review of these factors, the testimony of the prospective jurors and the evidence submitted in support of the motion that the trial court did not abuse its discretion when it denied the motion for change of venue on this basis.[38]
In a related argument, the defendant asserts that the trial court erred in failing to strike the first panel of prospective jurors even though one member of the panel announced before the entire group that he would vote guilty based on what he had heard in the media. The record shows that during the first panel of prospective juror questioning, the trial judge was attempting to ascertain how many members of the panel had heard about the case and whether they had formed an opinion about the defendant. One prospective juror, Mr. Costanza, indicated that he had formed an opinion.
When asked if he could set aside that opinion, Mr. Costanza answered, "[t]o be honest with you, I would have to wait and see the evidence before I could tell you I would make that decision. I am just not sure until I see what is put before me, your Honor."[39] After further instruction from the trial judge, Mr. Costanza stated: "[w]ell, based on the hearsay, I would vote against it right now" and "I would vote guilty right now based upon what I have done § sic heard and what I have seen on the news, your Honor."[40] The trial *321 judge cautioned him, and the rest of the panel, that he was not asking what the prospective jurors' opinions might be, just whether they had formed an opinion at all.[41] After that, questioning of this panel continued.
The next day, defense counsel announced his objection:
Yesterday during the process, there was a Mr. Costanza who was a juror, a potential juror who said in front of the entire panel, if I got his quote correctly, "I would vote guilty based on what I heard so far." The entire panel, including these people we just cleared heard him say that, and quite frankly, Judge, I think that poisoned the panel. I would move that everybody be stricken at this point. I would also move  everybody at this point be stricken and also move for a mistrial in that if we are striking these jurors based on this statement, that we are now prevented from picking a jury from potential people who we normally would have had on the jury.[42]
Defense counsel noted that, in addition to objecting to the panel, he was also moving for a mistrial.[43] The trial judge responded:
Furthermore, today additional questions were asked of each of the members that were in the panel and I was satisfied with the answers that were given today and have denied the various motions on the death penalty and yesterday, even after the statement that Mr. Costanza made, we had additional questioning on the issue of prior knowledge and publicity that they read or heard about in the case, so I think the rulings are of record already on it and certainly, you can note it on this, but to § sic; the extent that is a motion for mistrial, it is denied.[44]
La.C.Cr.P. art. 775 states in part that a defendant's motion for mistrial shall be ordered "when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." The "prejudicial conduct" may include remarks of veniremen during voir dire. State v. Carmouche, XXXX-XXXX p. 20 (La.5/14/02), 872 So.2d 1020, 1035. However, mistrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. Carmouche, XXXX-XXXX p. 20, 872 So.2d at 1035; State v. Wessinger, XXXX-XXXX p. 24 (La.5/28/99), 736 So.2d 162, 183, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999). "A trial court need not order a new trial [or dismiss a jury panel] absent a showing that comments made by a prospective juror affected other jurors or prejudiced the defendant." Carmouche, XXXX-XXXX p. 20, 872 So.2d at 1035; State v. Cushenberry, 407 So.2d 700, 701-702 (La.1981); State v. Hutto, 349 So.2d 318, 320 (La.1977). The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge; this decision will not be overturned on appeal absent an abuse of that discretion. Carmouche, XXXX-XXXX p. 20, 872 So.2d at 1035; Wessinger, 98-1234 p. 24, 736 So.2d at 183. In deciding the correctness of the trial court's voir dire rulings, a reviewing court considers the entirety of the voir dire record. Carmouche, XXXX-XXXX p. 20, 872 So.2d at 1035; State v. Hall, 616 So.2d 664, 669 (La.1993).
We find no abuse of discretion in the trial court's denial of the defendant's motion *322 for mistrial on this basis. As noted by the trial judge, the same panel members who heard Mr. Costanza's opinion were questioned further about whether they, too, had formed an opinion about the defendant. In light of the trial court's careful subsequent questioning, we are convinced that the comments of Mr. Costanza did not affect other prospective jurors or prejudice the defendant. Finding that the defendant did not show substantial prejudice from the remark that would deny him the opportunity of a fair trial, we hold that there was no abuse in the trial court's ruling.
In addition, we find no reversible error in any of the other assignments of error raised by the defendant and discussed in the unpublished appendix to this opinion.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. Sup.Ct. Rule 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report (UCSR) and Capital Sentence Investigation Report (CSI) as required by La. Sup.Ct. Rule 28, § 3(b). These documents reveal that the defendant, Michael Weary, was 20 years of age at the time of the offense. He was born in Hammond, Louisiana to Diane Sibley and George Brumfield. At the time the report was generated, his parents were no longer together and his father was married to another woman and residing in Oakland, California. The defendant completed the tenth grade; although he enrolled in a G.E.D. program, the defendant never completed the program. The defendant is the single father of two children. He has no mental health problems, although he stated he had a substance abuse problem with marijuana for four years prior to his arrest for the present offense.
The defendant was employed by J & M Warehouse in Pontchatoula, Louisiana, in November, 1997. He also claimed to have been employed with Target Stores, Inc., in 1998, while residing in Oakland, California.
As for the defendant's criminal history, the CSI indicates that he had juvenile arrests for disturbing the peace in November 1994 and armed robbery and disturbing the peace in January 1995.
As an adult, the defendant was arrested for aggravated assault in August 1995 and January 1996, but the charges were rejected. In April 1996, the defendant was arrested for theft by shoplifting and, in September 1996 was arrested for an unspecified offense (denominated "IWC" in the CSI report). In October 1996, the defendant was arrested for disturbing the peace with criminal damage to property. An attachment was issued and a judgment in the amount of $250,000 was rendered in connection with this matter. In November 1996, the defendant was arrested and charged with two counts of armed robbery, one count of carjacking, one count of disturbing the peace and one count of damage to property. In September 1997, the charges were amended to two counts of simple robbery and the defendant pleaded guilty. He was sentenced to serve seven years at hard labor in the Louisiana Department of Corrections as to each count, to run concurrently. This sentence was suspended and the defendant was placed on probation for a period of *323 five years with special conditions. His probation was revoked in March 1999.
In February 1997, the defendant was charged with simple assault. He was also arrested for simple battery in April and June 1997. In February 1998, the defendant was arrested for possession of crack cocaine with the intent to distribute and the possession of a Schedule 1 narcotic, to which he pleaded no contest in September 1999 and was sentenced to concurrent terms of five years and six months imprisonment at hard labor. In March 1998, the defendant was arrested for theft and resisting arrest. In January 1999, the defendant was arrested for aggravated battery and the unauthorized use of a movable. In March 1999, the defendant was arrested for remaining on premises after forbidden. In April 2000, the defendant was charged in the instant offense with first degree murder, carjacking, armed robbery and aggravated kidnapping.
Since his arrest on the instant charges, the defendant was charged with the second degree battery of a fellow inmate in November 2001. After receiving numerous punches and kicks from the defendant to the head and body, the inmate required medical attention for the injuries.

Passion, Prejudice or other Arbitrary Factors
The first degree murder of Eric Walber occurred on April 4, 1998, and following jury selection in Livingston Parish, trial on the merits commenced on March 2, 2002, almost four years after the crime was committed. While many of the prospective jurors indicated that they recalled hearing about the crime at the time Walber was killed, relatively few members of the petit venire had been unduly influenced by newspaper or television reports. The trial court denied the defendant's motion to change venue. As addressed in our review of Assignments of Error 5-7 in the published opinion, there was no abuse of the trial court's discretion in denying this motion.
The defendant is an African-American male, who was 20 years old at the time of his offense. The murder victim was a 16-year old Caucasian male, Eric Walber.
Although the defendant raises race as an important aspect of the trial, our review of the record shows that race was not a factor in this case. We find that there were no improper considerations of race either in voir dire or at trial. The defense urges that the state exercised one peremptory challenge discriminatorily to exclude an African-American potential juror from the jury, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). As addressed in our review of Assignments of Error 12-13 in the unpublished appendix to this opinion, the trial court found that the defendant failed to present a prima facie case of purposeful discrimination. No prejudice is apparent.
Testimony establishes this was not a racially-motivated crime. The victim in this matter was selected at random based only on the fact that the defendant and his co-participants were not familiar with the victim's vehicle. Testimony establishes that the identity and race of the victim was not known until the defendant and his co-perpetrators stopped the vehicle and began to assault the driver.
The defendant raises another instance in which he claims an arbitrary factor was interjected into his capital trial, i.e. the manner in which the state proved his prior conviction for simple robbery in the penalty phase of trial. However, this allegation was addressed and found to be without merit in our review of Assignment of Error 28 in the unpublished appendix to this opinion.

*324 Aggravating Circumstances
The jury unanimously found that the murder was committed during the perpetration or attempted perpetration of an armed robbery and a second degree kidnapping. In addition, the jury unanimously found that the murder was committed in a heinous, atrocious and cruel manner. As discussed above, we did not have to find that an armed robbery was committed, as all of the elements of the lesser included offense of simple robbery were established. Simple robbery also supports an aggravating circumstance under La. C.Cr.P. art. 905.4. In addition, the evidence was sufficient to support the jury's findings that the murder was also committed during a second degree kidnapping and that the murder was committed in a heinous, atrocious and cruel manner.
Even if there was not sufficient evidence to support an aggravating circumstance, this court would not be required to disturb the jury's sentence of death. Manning, XXXX-XXXX p. 80, 885 So.2d at 1111, and cases cited therein ("The failure of one statutory aggravating circumstance found by the jury to support a death sentence does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings."). As we stated previously, since simple robbery is a lesser included offense of armed robbery, the evidence for both was the same except for evidence concerning a weapon, thus, no arbitrary factor was injected into the proceeding.

Proportionality Review
In a supplemental assignment of error, raised in the defendant's reply brief, he challenges his death sentence as disproportionate and arbitrary in light of the sentences that his co-perpetrators received in their trials. Basing his information on a newspaper article not part of this record, the defendant states that the first degree murder trial of his co-indictee, James Skinner, ended in a mistrial. The state then dropped the charges to second-degree murder and obtained a conviction. Skinner is, therefore, serving a life sentence. Randy Hutchinson, the defendant's other co-indictee, entered a nolo contendere plea to manslaughter and received an agreed-upon sentence of 20 years. The defendant argues that since he, alone among the co-defendants, has received a death sentence, this fact demonstrates his sentence is arbitrary and disproportionate in violation of the federal and state constitutions.
As a general rule, the fact that a co-defendant has received a more lenient sentence does not necessarily indicate that the penalty imposed on the defendant is excessive. State v. Tate, XXXX-XXXX p. 26 (La.5/20/03), 851 So.2d 921, 940, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). "Disparities are inherent in a system where punishment is tailored to fit the defendant and the crime. The Equal Protection Clause only dictates that all defendants be afforded the same sentencing considerations and does not compel any particular result." State v. Day, 414 So.2d 349, 352 (La.1982). The evidence in this case showed that the defendant was the individual who originated the idea of robbing the driver of the red car; the defendant initially assaulted the victim when Walber stopped his car in order to avoid Hutchinson in the middle of the street; the defendant took the victim's money, ring, and vehicle; the defendant acted as the leader of the group of men who forcibly carried the victim from place to place; the defendant participated in beating the victim at other locations; the defendant held the victim in front of an oncoming car and released the victim so that he would be run over; and the defendant was seen with more of the victim's *325 belongings after the murder, including the victim's car. Consequently, the defendant's role in the crime was hardly minor, nor was the evidence against him insubstantial. Tate, XXXX-XXXX p. 26, 851 So.2d at 940 (defendant sentenced to death, other perpetrators allowed to plead guilty to manslaughter, first degree murder without death and accessory after the fact); State v. Chester, 1997-2790 p. 23 (La.12/1/98), 724 So.2d 1276, 1289, cert. denied, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999) (defendant received death sentence, co-defendant tried and convicted of second degree murder).
Although the federal constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991).
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The state's Sentence Review Memorandum reveals that since 1979, 20 cases have originated as first degree murder charges in Livingston Parish, including the defendant's case. Of those, juries have recommended the death penalty for three defendants. The first, George Brooks, participated with his co-defendant James Copeland in the repeated rape and eventual murder of an 11-year old boy. After initially remanding his case to the trial court for a hearing on a motion for new trial, this court affirmed Brooks' conviction and sentence of death. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). However, the court then granted Brooks a new trial on grounds that he had received ineffective assistance of counsel at both stages of his first trial. State v. Brooks, 1994-2438 (La.10/16/95), 661 So.2d 1333. The disposition of the case on remand from this court remains unknown, although the state's Sentence Review Memorandum indicates that the retrial of the sentencing phase for Brooks was scheduled for 2004.[45]
The second defendant sentenced to death in Livingston Parish, Thomas Sparks, a/k/a Abdullah Hakim el-Mumit, shot and killed a Tangipahoa Parish Sheriff's deputy. El-Mumit was convicted and sentenced to death. However, his appeal, State v. Sparks, 88-0017, is presently pending in this court due to a remand to the district court for determination of a Brady claim.
Given the scarcity of comparable cases in Livingston Parish, it is appropriate for this court to look beyond the 21st Judicial District and conduct the proportionality review on a statewide basis. State v. Davis, XXXX-XXXX p. 34-35 (La.5/23/94), 637 *326 So.2d 1012, 1031, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). We have determined that the evidence supports the following aggravating circumstances: (1) that the murder was committed during the perpetration or attempted perpetration of a second degree kidnapping and a simple robbery and (2) that the murder was committed in a heinous, atrocious and cruel manner.
The cases are legion in which this court has affirmed capital sentences based on a finding of multiple aggravating circumstances. However, focusing solely on the aggravating circumstance that the murder was committed in a heinous manner, we find this court has affirmed death sentences in cases in which the victims experienced great pain and were aware of their impending doom. See State v. Rault, 445 So.2d 1203, 1219 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984) (victim was raped, strangled, stabbed in the neck and shot twice); State v. Willie, 436 So.2d 553, 556-557 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984) (victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped and had her throat repeatedly slashed); State v. Moore, 414 So.2d 340, 348 (La. 1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983) (victim received thirteen stab wounds and died slowly "with awareness of her impending death"); State v. Hoffman, XXXX-XXXX (La.4/11/00), 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000) (victim carjacked, kidnapped, robbed, raped and shot execution style after which she survived for a few minutes in a remote area completely nude on a cold November evening); State v. Legrand, XXXX-XXXX (La.12/3/03), 864 So.2d 89, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005) (victim stabbed over 25 times with a variety of utensils including plastic and wooden handled knives, screwdrivers and scissors, three of which stab wounds were fatal); State v. Manning, XXXX-XXXX (La.10/19/04), 885 So.2d 1044, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005) (abduction and brutal beating of an elderly, 62-year old woman, left in a remote location). A portion of the UCSR asks for general comments concerning the appropriateness of the sentence imposed in this case. Here, the trial judge responded:
The evidence introduced at trial clearly supports the jury's finding that the murder was committed in a heinous, cruel and unusual manner. If ever a capital punishment were appropriate, it would apply to this case.
Given the kidnapping, robbery and brutal beating the victim endured before being held up and released in front of his speeding vehicle, a review of capital verdicts in which the victim suffered great pain and was aware of his or her impending doom does not suggest the defendant received a disproportionately harsh sentence.

DECREE
For the reasons assigned herein, and within the unpublished appendix made part of this opinion, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. *327 art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
WEIMER, J., concurs and assigns reasons.
JOHNSON, J., dissents and assigns reasons.
WEIMER, J., concurring.
I concur in the determination that affirms the jury's verdict that the defendant is guilty and in the majority's resolution of the various assignments of error. However, as to juror Tara Matthews (See unpublished appendix pp. 54-57), I would find the trial court did not err in finding nothing said by the prospective juror rose to the level to merit granting a challenge for cause. As such, I find it unnecessary to state that a defendant who fails to exercise a peremptory challenge against a potential juror challenged for cause waives his right to assert as error on appeal the denial of the challenge for cause. See State v. Scott, XXXX-XXXX, 921 So.2d 904, at 933 ((La.1/19/06) (Weimer, J., concurring)) and State v. Juniors, 2003-2425 (La.6/29/05), 915 So.2d 291, Weimer, J. on reh'g.
JOHNSON, J., dissenting and assigning reasons.
This case involves the brutal murder of a 16 year old high school honor student who was killed while working as a delivery boy for a Pizza store in Albany in Tangiapohoa Parish, Louisiana. The young man's body was discovered along a deserted stretch of roadway in Livingston Parish, Louisiana.

CHANGE OF VENUE
The defendant argues that the trial court erred in refusing to grant his motion to change venue, which "led to the impanelment of biased jury primed to convict and condemn." The motion of change of venue suggested that the defendant could not receive a fair trial in Livingston Parish because of the extensive publicity in the Livingston Parish community. During the three years from the time of the crime and the beginning of trial, more than sixty(60) newspaper articles were published addressing the crime, the victim and his family. The crime was also featured on local televison and the network televison show "American's Most Wanted".
Eighty-eight(88) of the ninety-six(96) prospective jurors questioned in voir, dire(91.7%), and ten of the twelve individuals(83.3 %) who were selected jurors in the case, testified that they were familiar with the facts of this case from publicity.
A defendant is guaranteed an impartial jury and a fair trial. La. Const. Art. 1 § 16. In State v. Bell, 315 So.2d 307, 311 (La.1975), this Court listed some of the factors the trial judge should consider when determining whether to grant a motion for a change of venue:
. . . (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude *328 of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
In order to accomplish this end, the law provides for a change of venue when a defendant establishes that he will be unable to obtain an impartial jury or a fair trial at the place of original venue. Id. at 309; Rideau v. Louisiana, 373 U.S. 723, 726-27, 83 S.Ct. 1417, 1419-20, 10 L.Ed.2d 663 (1963). Changes of venue are governed by LSA-C.Cr.P. art. 622, which provides:
A change of view shall be granted when the applicant proves that by reason of prejudice existing in the public mind, or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In unusual circumstances, prejudice against the accused may be presumed. Although extensive knowledge in the community of either the crimes or the putative criminal and his prior crimes is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob. See partiality. State v. David, 425 So.2d 1241 (La.1983); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); Rideau v. Louisiana, supra. Although defendant is not entitled to a jury that is totally ignorant of the case to be heard, Art. 1, § 16 of the Louisiana Constitution does grant him a right to trial by an impartial jury.
The facts and outcome in the Weary trial are critical to my conclusion that a change of venue should have been granted defendant. A defendant must prove more than community awareness of the facts surrounding his case. He must show that there exists a prejudice in the collective minds of the community that would make a fair trial impossible. State v. Wilson, 467 So.2d 503 (La.1985); State v. Felde, 382 So.2d 1384 (La.1980); State v. Sonnier, 379 So.2d 1336 (La.1979).
In the instant case, in rejecting the motion for change of venue, the trial court apparently found that the defendant failed to carry his burden of proof. Although the trial court possesses a broad range of discretion in this area, see e.g., State v. Willie, 410 So.2d 1019 (1982), the Courts are required to make an independent evaluation of the facts to determine whether the accused received a fair trial, unfettered by outside influences. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).
Due to the extensive media coverage in the case at bar, in addition to the notoriety of the case and the outrage in the community, the cumulative effect is that this defendant was deprived of a fair and impartial trial. For this reason, the conviction and sentence should be reversed and the case should be remanded for a new trial.

IMPARTIALITY OF JURORS
The defendant in a capital case is entitled under the Sixth and Fourteenth Amendments to an impartial jury in both the guilt and the penalty phase. Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The party seeking to exclude the juror has the burden to demonstrate, through questioning, that the juror lacks impartiality. Reynolds v. *329 United States, 98 U.S. 145, 25 L.Ed. 244 (1879). The key to deciding cause challenges against prospective jurors based on their views in favor of, or against the death penalty, is the determination of impartiality. Perhaps the most difficult tasks for the trial judge in ensuring the impartiality of a capital jury are (1) handling the death qualification portion of the voir dire and (2) ruling on challenges for cause to a prospective juror who has expressed his or her views toward the death penalty.

CHALLENGE FOR CAUSE
The defendant contends that the trial court erroneously denied thirteen (13) defense challenges for cause. The defendant contends that he was forced to use twelve (12) peremptory challenges for jurors who should have been removed for cause. Thus several objectionable jurors were seated, namely, Ardith Arneal, Rita Spillman, Joseph Sanchez, Patricia Cowart, John Johnson, and Jason Harer
I believe that the trial court erroneously denied the challenges for cause as to these jurors for the following reasons.

Ardith Arneal
Arneal was the first prospective juror that the defendant claimed should have been excused for cause in light of her fixed opinions about the case, her inclination to impose the death penalty upon conviction for first degree murder, and her past experience as a crime victim. During voir dire on publicity, juror Arneal testified that she initially heard about the case approximately three years before and recalled it when she saw publicity on the case. She remembered "that there were either five or six people involved, that it was a robbery of a pizza boy, that the pizza boy was run over with his own car, that it happened in Albany . . ." Juror Arneal conceded that based on what she learned from the newspapers and news, she had formed an opinion about the defendant's guilt but acknowledged that, "I can't honestly state that until after a trial."
Juror Arneal revealed a second basis for her removal for cause when she was questioned about her death penalty views. During examination by the prosecutor, she stated that she had discussed the issue with members of her family and had concluded that she agreed with the death penalty, but believed that it was not carried out efficiently: "I personally feel that we have too many people on death row. We are not doing it quick enough, but that is just my opinion." Also, she stated that she could vote for the death penalty in this case, but her ability to vote for life is going to depend on how heinous it is. "If in the back of my mind this is all I see, I don't know if I could vote for life . . . I still have the feeling that depending on the evidence and what happened, all of that would be sitting in the back of my mind."[1]
When defense counsel began to question the juror panel, he explained that a first degree murder verdict would mean that the jury had decided that the defendant had intentionally killed another human being under one of the circumstances outlined in the criminal statute. The following is the dialogue between defense counsel and juror Arneal:
Q. Knowing that you are convinced beyond a reasonable doubt, that this was an intentional killing, this is not a passion killing, this is not manslaughter, this is not a negligent homicide, this is not justifiable-none of the stuff, this is an intentional killing, this is what you have decided to get to this point. Knowing *330 that has been your decision and that you are convinced of that, is the death penalty automatic at that point? Do you feel like eye for an eye, tooth for a tooth, you meant to kill that man, you need to die? Mrs. Arneal, please, I am going to ask you basically the same question unless you want me to repeat any of it, I am not going to go through the whole thing again.
A. For me it would be cut and dry, yes.
Q. Automatic death?
A. Yes.
Q. Nothing I could do would change your mind?
A. Probably not. I am being honest.
During general voir dire, Arneal revealed that several years before, she had been a victim of domestic violence; although, she initially stated that this experience would not impact her ability to be fair in this case. She later concluded that her past experience as a crime victim could prejudice her if she was forced to view graphic photographs. When asked whether she could be fair, she stated, "I can not guarantee it, no." Arneal agreed this was based on her past experience. Following this colloquy, defense counsel challenged Arneal for cause, which was denied by the trial court.
In the instant case, the trial court stated:
THE COURT:
All right. I have got one question for three of ya'll. I want to ask Mrs. Porter, Mrs. Arneal, and Mr. Harer. All right. I read to you earlier what it is that I have got to do. I am going to repeat it, but I am going to paraphrase it to you.
All of these last questions came concerning the second portion of the trial. That is the sentence portion of the trial. Now, part of what you must do in Louisiana to serve as a juror is that you must follow the law that I charge you with. I am going to tell you what the law is in the State of Louisiana. As a juror you are bound to follow the law. Do each of you understand that ?
PROSPECTIVE JUROR ARNEAL:
Yes, sir.
THE COURT:
I will instruct you at some point if you are a juror if you a juror in this case, and if you get to that second phase that we are talking about, the penalty phase, that you must consider, consider aggravating circumstances, and any mitigating circumstances that the defendant may offer.
BY THE COURT
Q. All right. Mr. Porter, are you going to be able to do that?
A. Yes, sir.
Q. Mrs. Arneal?
A. With no real choice in the matter, I would have to.
The trial court did not question Arneal about her ability to consider life imprisonment as a punishment for first degree murder. Rather, the trial court instructed her and the other prospective jurors about the law that would require them to consider both aggravating and mitigating circumstances, without any explanation regarding the sentencing process. What should have been asked is "Can you likewise return the sentence of life imprisonment ?" The omission of this query is error patent with a pro-death juror like Arneal. Under these circumstances, where Arneal actually served on the jury that sentenced the defendant to death, the defendant was forced to accept a biased juror. Arneal and the others on the jury panel were not queried as to whether she could seriously consider the sentence of life imprisonment, which is *331 the law. State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280.

Rita Spillman
Ms. Spillman is the second prospective juror that the defendant claimed should have been excused for cause in light of her belief in the defendant's guilt and her distraction by a personal family matter. During voir dire, Spillman recalled hearing that the instant crime had "something to do with drugs . . . and this young man killed this other young man to prove a point, to prove that he could get his hands on who ever he wanted to get his hands on." She further stated that she had recently read about the case and learned that the victim was kidnapped and taken to a deserted road and run over with a vehicle.
During the following colloquy between the prosecutor and Spillman, she indicated that she did not agree that the defendant was presumed innocent:
Q. Right now as Michael Weary is sitting over there, he is presumed to be innocent of the charge that the state has brought against him. Would you agree with that?
A. No.
Q. No, All right. The judge is going to instruct you if you were selected to be a juror, he is going to instruct you that you are to decide this case or base your verdict on the evidence that you hear in the courtroom and not from any other outside source. And that you have to be convinced beyond a reasonable doubt that the defendant is guilty of the charge and you will take an oath to follow that instruction. Can you do that?
A. Well, like I said earlier, my mind is not going to be here, so I really, Yes.
Q. And so, as far as having an opinion right now as to whether or not Michael Weary is guilty of this charge, do you have an opinion?
A. Yes, ma'am
Q. What is that opinion?
A. Guilty.
Q. If I-let's say you were selected as a juror, we came in here and gave an opening statement and then I did not call a single witness, nothing, I did not put on any evidence and the judge said okay, you have to go back there and have to deliberate. You have not received any evidence but you have to go back and return a verdict, how would you vote?
A. Guilty
Q. Based on what?
A. On just what I have read and what I have heard.
Q. So, you are telling me you cannot put that out of your mind?
A. Yes, ma'am.
Q. Do you think it is more you just don't want to be here than what you read?
A. More that I don't want to be here because of the circumstances of what is coming next week at my house. My daughter's surgery and my son and his family is coming.
The trial court attempted to rehabilitate Spillman but her responses were insufficient to overcome her opinion as to the defendant's guilt. The following colloquy occurred between the trial court and Spillman:
THE COURT:
Q. .......Now, you are not really telling me that if you were serious as to the last question Ms. Hebert asked you, that if you actually-I mean, right now it and vote on anybody, whether it was this defendant or anybody else, that you would be willing to put them to death, *332 having not heard any evidence whatsoever?
PROSPECTIVE JUROR SPILLMAN:
A. No, I misunderstood that.
THE COURT:
Q. All right. Let me ask you this. She said find him guilty and you said guilty. I said death which is different.
PROSPECTIVE JUROR SPILLMAN
A. The death is
THE COURT:
Q. Do you understand, of course, we have not gotten that far, but that he is charged with first degree murder?
PROSPECTIVE JUROR SPILLMAN
A. Yes, sir.
THE COURT:
Q. Do you understand that if you said he is guilty, that you would be saying I am willing to sentence him to life imprisonment without benefit of parole, probation, or suspension of sentence?
PROSPECTIVE JUROR SPILLMAN
A. Yes, sir.
THE COURT:
Q. And would you be willing to do that without having heard any evidence at all?
PROSPECTIVE JUROR SPILLMAN
A. No, sir. I would have to hear evidence.
Defense counsel followed up the trial court's questioning and asked Spillman about the information she had heard about the crime. Spillman stated that, from what she heard and read, she believed that the defendant was guilty. Spillman stated, "But if I come in hear and hear otherwise, you know, I mean, I don't know what I am trying to say. But when you hear things on the outside then you automatically form opinions that I know you are not supposed to." The State then questioned Spillman who stated that she could not be fair to the defendant, not because of her opinion as to his guilt, but "because her mind is not going to be in this courtroom ....because of the situation in my family next week."
Spillman's preconceived opinion was that the defendant was guilty, based on publicity and rumors she had heard prior to trial. Further, whether based on her opinions about the crime or her concerns for her daughter's upcoming surgery-or both, Spillman repeatedly testified that she could not be fair to the defendant if selected as a juror. Therefore, the trial court erred in denying the defense's challenge for cause as to Spillman. See. LSA-C.Cr. P. Art. 797; State v. Sugar, 408 So.2d 1329, 1331 (La.1982).

Joseph Sanchez
Capt. Joseph Sanchez Jr., the Patrol Commander of the Denham Springs City Police Department in Livington Parish, Louisiana, was another prospective juror. The defendant contends that the trial court erred in denying his challenge for cause based on Sanchez' experience as a police officer. The defendant argues that Sanchez should have been excused based on his testimony that he might be biased in favor of the State in a close case because of his experience as a police officer. During general voir dire, Sanchez indicated to the trial court that he knew the deputies who were listed as State's witnesses, but Sanchez stated that this would not have any bearing upon his ability to be fair and impartial. In response to defense counsel questioning, Sanchez stated:
I am perfectly capable of making decisions and determining right from wrong in gray areas but because of my background and my length of time working with these people, I may put more credibility on the prosecution side and I am not saying that I would, and I hope I would not.
*333 LSA-C.Cr. P. Art. 797, provides in pertinent part, that the defendant may challenge a juror for cause on the grounds that:
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict
However, there is no per se bar to members of law enforcement serving as criminal jurors. In State v. Ballard, 98-2198 (La.10/19/99), 747 So.2d 1077, this Court unanimously overruled State v. Simmons,[2] 390 So.2d 1317 (La.1980), holding that if a law enforcement officer indicated during voir dire that he could be an impartial juror, the trial court has the discretion to determine whether challenge for cause is warranted. In State v. Hallal, 557 So.2d 1388, 1389 (La.1990), this Court noted that while the trial judge is accorded broad discretion in ruling on challenges for cause, "[a] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Jones, 474 So.2d 919, 926 (La.1985); State v. Smith, 430 So.2d 31 (La.1983); State v. Monroe, 366 So.2d 1345 (La.1978). This Court held that the prospective juror in Hallal, who indicated she would tend to believe the State's police witnesses whom she knew, should have been excused for cause. Sanchez readily admitted that in a "close call," he would put more credibility on the prosecution's side of the case rather than the defense's side of the case, and therefore, he should have been excused for cause.

Patricia Cowart
Patricia Cowart is another juror that the defendant challenged for cause based on her fixed opinions about the case. Cowart testified that she formed her opinions based on her exposure to pre-trial publicity and did not think that she could put them aside and make a decision based solely on the evidence presented at trial. Based upon Cowart's response, the trial judge attempted to rehabilitate Cowart by making a reference to Orson Welles' War on the Worlds[3] and asked her if she could base her opinion on the facts and the evidence presented at trial. Cowart responded:
I am trying to think about this. With the opinions that I have formed as of first hearing what I heard on televison and then hearing otherwise, it is-I think it would be difficult for me, I really do.
The trial court's attempt to rehabilitate Cowart was insufficient to overcome her preconceived opinions. Cowart formed her opinions about the crime on the basis of what she read in the newspapers, saw on television, and what she heard in conversation with others. Thus, the trial court erred in not excusing Cowart for cause. See State v. Smith, 491 So.2d 641 (La.1986).
The defendant contends that the trial court erred in refusing to excuse John Johnson and Jason Harer, who both indicated *334 that they would be more inclined to impose a death sentence upon a conviction for first degree murder.
The seminal decision on the death qualification of prospective jurors is Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), in which the Supreme Court examined an Illinois law that authorized a cause challenge for jurors who voiced general misgivings about the death penalty. Based on that statute, nearly half of the veniremen in the case were excused for cause. Rejecting the broad statutory authorization for challenging jurors with "conscientious scruples against capital punishment," the Supreme Court reversed the death penalty. The Supreme Court held that this statutory procedure did not result in an impartial jury as required by the Sixth Amendment, but resulted instead in a jury "uncommonly willing to condemn a man to die." Id. at 521, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. The Supreme Court emphasized that veniremen cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment, and that a prospective juror cannot be expected to say in advance of trial whether he would in fact, vote for the extreme penalty in the case before him. The Witherspoon decision thus involved the issue of a limitation on a state's power to exclude jurors, rather than the issue of the appropriate grounds for challenging capital jurors. However, the Court in a footnote, indicated that nothing in the decision prevented approval of a death penalty imposed by a jury from which only "those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial . .., or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt were excluded." Id. at 522-23 n. 21, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (emphasis in original).
In Louisiana, a juror in a capital case must be willing to consider the imposition of both a death sentence and a life sentence, based on all of the evidence and on the instructions given by the trial judge. At the conclusion of the evidence, a juror must find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, and then must consider any mitigating circumstances (statutory or otherwise) before determining whether or not the death sentence should be imposed. La.Code Crim. Proc. art. 905.3. See Blystone v. Pennsylvania, 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)("[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence."). While a juror has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstance established by the evidence, the juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant (which is the focus of a capital sentencing hearing) and must be willing to fairly consider a life sentence. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In a "reverse-Witherspoon" context, the basis of the exclusion is that a prospective juror "will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before him . . ." See State v. Rome, 630 So.2d 1284 (La.1994).[4]

*335 John Johnson[5]
During the defense counsel's examination of Johnson, he stated that he could impose the death penalty if he were absolutely certain that the defendant committed the crime. He stated further that personally, he believed that "if somebody takes a life, I think he should forfeit his." The defense counsel asked, "I think you just told me, guilty of first degree murder, intentional killing of another human being, automatically that person should be put to death," Johnson replied, "No, not automatic." Johnson explained that if "the sentence by (the defendant's) peers is to die, then I think it should be carried out." Johnson stated that he could consider various circumstances in mitigation of a death sentence and that he would consider mercy if asked whether or not to put someone to death. Johnson further stated, "If I don't think he is guilty, then I am going to say he is not ... But if I think he is guilty, then I am going to be saying yes all the way through."
The State cannot argue that Johnson, Arneal, Cowart and Harer stated a willingness to consider life imprisonment. Johnson and the others on the jury panel were not queried as to whether they could seriously consider the sentence of life imprisonment, which is the law. What should have been asked was "Can you likewise return the sentence of life imprisonment without benefit of parole, probation, or suspension of sentence?" The omission of this query is error patent with a pro-death juror. Under these circumstances, where the juror actually served on the jury that sentenced the defendant to death, the defendant was forced to accept an obnoxious juror. See State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280; and Johnson, J, dissent in State v. Scott, XXXX-XXXX,(La.01/19/06), 921 So.2d 904

Jason Harer[6]
Jason Harer expressed his inclination to impose a death sentence upon conviction for first degree murder. During voir dire, defense counsel asked Harer if he would automatically vote to impose the death penalty if he were convinced that the killing had been intentional. The following colloquy occurred:
DEFENSE COUNSEL:
Q. I understand you would consider it.
JUROR HARER:
A. Not consider, but I would, that would be my vote, I guess.
DEFENSE COUNSEL:
Q. You would automatically vote death?
JUROR HARER:
A. Yes, automatically.
DEFENSE COUNSEL:
Q. Is there anything you would be interested in hearing from the defense, as to why this person's life should be spared
JUROR HARER:
A. If he had intentionally killed the person, I really I don't know if they *336 could give me a reason why, I am not really sure.
When the trial judge attempted to rehabilitate Harer, the following colloquy occurred:
BY THE COURT:
I will instruct you at some point if you are a juror in this case, and if you get to that second phase that we are talking about, the penalty phase, that you must consider, consider aggravating circumstances, and any mitigating circumstances that the defendant may offer.
BY THE COURT
Q. All right. Mr. Harer, are you going to be able to do that?
PROSPECTIVE JUROR HARER:
A. Yes, sir.
BY THE COURT:
Q. You will follow the law?
PROSPECTIVE JUROR HARER:
A. Yes, sir I will, definitely.
The trial judge's attempt to rehabilitate Harer was insufficient and did not change his initial inclinations to vote automatically for the death penalty. Harer and Johnson both expressed their inclinations on the conviction of first degree murder, i.e., they would automatically vote to impose a death sentence. Harer and Johnson both had already formed an opinion on the merits, and the presence or absence of either aggravating or mitigating circumstances would be irrelevant to such a juror. Morgan, supra; Jacobs, supra.

Falonda Miles
Falonda Miles was an African American in the venire. The State challenged her for cause on the basis of her views on the death penalty. During voir dire, Miles indicated that she could not consider imposing the death penalty. However, on further questioning by defense counsel, she testified that there were some crimes that incensed her so much that she could consider imposing a death sentence for them. An example of the type of case in which she felt she could vote for the death penalty was one when a child is killed by an adult. The State made no effort to question Miles, nor did the trial judge attempt to rehabilitate her, before excusing her for cause.
The defense counsel argued that the trial court excused a juror who, despite Miles general opposition to the death penalty, remained qualified to serve in this case because it involved the killing of a minor(the victim was 16 years old when he died) by an adult (the defendant was 20 years old at the time of this crime). Miles was a qualified prospective juror that the trial court failed to rehabilitate or question regarding her views on the death penalty. Further, Miles' view on the death penalty did not differ significantly from the views expressed by several Caucasian prospective jurors who were not excused by the trial court for their views on the death penalty.

Batson Challenge
The defendant contends that the State exercised a peremptory challenge on the basis of race when it struck Jennifer Page, the only African-American to survive cause challenges resulting in an all white jury. Page was one of only two African Americans who were questioned. Defense counsel noted that there were nine African Americans in the pool of 260 prospective jurors(i.e. 3.5%). It is clear from this record that the state used its challenges in a deliberate fashion to exclude African-Americans from the jury and create an all white jury. In doing so, the state deprived this defendant of his right to a trial by a jury of his peers which is guaranteed by the Sixth Amendment to the United States Constitution.
*337 The defense raised an objection when Page was struck with the State's first peremptory challenge pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under Batson a defendant must establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of race. The burden then shifts to the state to come forward with a race-neutral explanation. If a race-neutral explanation is tendered, the trial court then must decide, in step three, whether the defendant has proven purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834(1995) (per curiam) (citations omitted); State v. Collier, 553 So.2d 815, 818 (La.1989).
In the instant case, the trial court denied the Batson challenge, without requiring the State to provide any race-neutral explanation for its removal of Page. The trial court stated the following:
BY THE COURT:
Well, I am satisfied that at this point this is the first black juror that has been stricken(sic) by yet. I don't know that it comes under Batson yet. I don't think it has been a sufficient showing to show there has been a systematic effort on the part of either side, but particularly-technically since it is Batson under the State's efforts to exclude any particular race or minority from the jury venire.
The trial court erred in concluding that no prima facie case of discrimination had been established. One African American, Falonda Miles had been struck for cause, and only one prospective juror remained who was African American. This failure to require race neutral reasons for the strike means the opportunity was lost. See, e.g. State v. Givens, 99-3518(La.01/18/01), 776 So.2d 443; State v. Myers, 99-1801(La.04/11/00), 761 So.2d 498; State v. Williams, 524 So.2d 746(La.1988).
Since Louisiana allows parties to use peremptory challenges to "back-strike" jurors pursuant to LSA-C.Cr.P. art. 795, we must allow criminal defendants to assert a Batson objection to previously excused jurors. It was impossible to see the pattern of racial discrimination until after several African-Americans have been excluded. The prosecution should be required to provide a race-neutral reason for each peremptory challenge.
In addition, the defendant raises several valid concerns with regard to the sufficiency of the evidence, and Brady violations. However, I believe that the errors committed in the jury selection process, i.e., the selection of jurors with preconceived opinions as to the defendant's guilt and inclinations to automatically impose the death penalty on a conviction of first degree murder without considering life imprisonment, are sufficient reasons to reverse the conviction and sentence, and to remand this matter to the trial court for further proceedings.

ON REHEARING
WEIMER, J., on rehearing, would grant in part.
Although I agree with the resolution of this matter, I would grant for the limited purpose stated in my concurrence. I find it necessary for the opinion to state that a defendant who fails to exercise a peremptory challenge against a potential juror challenged for cause waives his right to assert as error on appeal the denial of the challenge for cause.
NOTES
[1] The cause of death was officially noted as multiple sharp and blunt trauma to the body and especially the head, with subdural subarachnoid hemorrhages of the brain and skull fracture.
[2] Cheri Walber could not identify her son by his facial features. Not until she looked at his tennis shoes and the rest of his body was Ms. Walber able to recognize her son.
[3] The dates these statements were recorded are: (1) April 18, 2000 at 10:07 a.m.; Vol. 1, p. 127-132; (2) April 28, 2000 at 10:36 a.m.; Vol. 2, p. 339, 337, 334, 341-345; (3) April 25, 2000 at 11:21 a.m.; Vol. 1, p. 133-147; and (4) May 1, 2000 at 2:50 p.m.; Vol. 1, p. 148-161.
[4] Police interviewed Scott and obtained an unrecorded statement from him on April 24, 2000. Vol. 2, p. 338, 340.
[5] The state presented evidence that on April 21, 1998, the Livingston Parish Sheriff's Department arrested Hampton on an unrelated charge and took a picture of him. That picture shows a little healed-over area of skin between his eyes, just above his nose.
[6] Brewer named this date a Friday, not a Saturday as was established by all the other witnesses, but later stated he was not sure about dates.
[7] The man who cut grass for the church found a dark black, tri-fold wallet which contained the driver's license of a 16 or 17 year old white boy in the grass of the church across from the Ashton's property. The wallet did not contain any money.
[8] Defendant's assignments of error that are not treated in the main body of this opinion will be reviewed in an unpublished appendix which will comprise part of the record in this case.
[9] La. R.S. 14:30(A)(1) provides:

A. First degree murder is the killing of a human being:
(1) When the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, simple robbery, or terrorism.
[10] The evidence may also have supported the finding that the specific intent killing was done during the perpetration or attempted perpetration of an armed robbery. "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. R.S. 14:64. There was testimony from which the jury could find that the defendant armed himself with a gun at some time that night in order to effectuate the taking of Walber's possessions and vehicle. In addition, the manner in which the policeman's nightstick, and the victim's car, were used was calculated to produce or likely to produce death or great bodily harm. La. R.S. 14:2(3). Thus, these instrumentalities could have been found to be dangerous weapons sufficient to satisfy the requirements for armed robbery. See also discussion regarding the sufficiency of the evidence supporting the aggravating circumstances, infra.
[11] The state's notice of its intention to seek the death penalty was based on three of the following circumstances enumerated from La.C.Cr.P. art. 905.4:(1) the defendant, while engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, did commit the homicide of Eric Walber; (2) the defendant, while engaged in the perpetration or attempted perpetration of armed robbery, first degree robbery, simple robbery, did commit the homicide of Eric Walber; and (3) the defendant committed the homicide of Eric Walber in an especially heinous, atrocious, or cruel manner. Vol. 2, p. 330.
[12] La.C.Cr.P. art. 905.4(A)(1) and (7) provide, in pertinent part:

A. The following shall be considered aggravating circumstances:
(1) The offender was engaged in the perpetration or attempted perpetration of ... second degree kidnapping, ... armed robbery,. . . or simple robbery.
* * *
(7) The offense was committed in an especially heinous, atrocious or cruel manner.
[13] Vol. 8, p. 1820.
[14] Vol. 8, p. 1821-1822.
[15] Id.
[16] Id.
[17] Vol. 8, p. 1832.
[18] Vol. 8, p. 1832-1833.
[19] Vol. 8, p. 1828.
[20] Vol. 8, p. 1830.
[21] Vol 8, p. 1991.
[22] Vol. 8, p. 1989; Vol. 9, p. 2003.
[23] Vol. 9, p. 2008.
[24] Vol. 8, p. 1834.
[25] Appellant's brief, Exhibit C.
[26] Vol. 3, p. 622A.
[27] Vol. 3, p. 624-627A.
[28] Vol. 3, p. 625A.
[29] Vol. 6, p. 1494.
[30] Vol. 6, p. 1495-1496. The trial judge allowed defense counsel to introduce a copy of the article published in the Hammond Daily Star even though he did not recall any prospective juror stating that they had read that publication.
[31] See Defense Ex. 1.
[32] See Defense Ex. 2.
[33] Defense counsel referred to this paper as THE HAMMOND DAILY STAR. Vol. 6, p. 1495. This article appeared in the Sunday edition of that paper.
[34] This is the newspaper which the trial judge believed had not been read by any prospective juror. Defense counsel tacitly agreed. Vol. 6, p. 1495.
[35] See Defense Exhibit 3.
[36] See Defense Exhibit 4.
[37] The argument raised by the defense at trial in support of the motion for change of venue was that the prosecutor abused his discretion in prosecuting this case in Livingston Parish. Appellant's Brief, Exhibit C, ¶ 12. Insofar as this aspect is raised on appeal, we note that La.C.Cr.P. art. 61 provides in pertinent part that ". . . the district attorney has charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." Thus, the decision to institute prosecution against the defendant in Livingston Parish was within the district attorney's discretion. The record shows there were substantial reasons to proceed in Livingston Parish that had nothing to do with the race of the defendant, particularly considering that the victim and defendants were from Livingston Parish, that the initial kidnapping and robbery of the victim occurred in Livingston Parish, that all of the crime scenes except the final location where Walber was murdered were located in Livingston Parish, and where the investigation of the matter was undertaken by Livingston Parish authorities once Scott came forward with information.

Insofar as the defendant complains about the racial composition of the venire within the context of the motion for venue change, this argument was properly raised by the defendant in his motion to quash the jury venire, which was denied by the trial judge. See La.C.Cr.P. art. 532(9); Vol. 1, p. 93-94; Vol. 3, p. 623A; Vol. 7, p. 1704-1705. We note that the defendant does not appeal the denial of his motion to quash the jury venire.
[38] Appellate defense counsel relies in their argument upon several newspaper articles which are not of record. Even were we to consider this information, we find the defendant failed to show pervasive community prejudice against him. The record supports our conclusion that the trial judge engaged in a thorough, individual questioning of the potential jurors.
[39] Vol. 3, p. 648A.
[40] Vol. 3, p. 648A-649A.
[41] Vol. 3, p. 649A.
[42] Vol. 4, p. 752.
[43] Vol. 4, p. 752.
[44] Vol. 4, p. 752-753.
[45] As for co-defendant Copeland, he was tried and convicted in Tangipahoa Parish, also a part of the 21st Judicial District, and sentenced to death. Copeland's first appeal to this court resulted in reversal of his conviction and sentence. State v. Copeland, 419 So.2d 899 (La.1982). Following retrial, Copeland was again convicted of first degree murder and sentenced to death. On appeal, this court affirmed both the conviction and sentence. State v. Copeland, 530 So.2d 526 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).
[1] Although no one sought to clarify what Arneal meant by what was "in the back of (her)mind," it appears likely she meant that the pretrial publicity had led her to conclude that the death penalty should be imposed in this case.
[2] In Simmons, this Court held broadly that "actively employed criminal deputy sheriff is not a competent criminal juror."
[3] The trial judge noted that Welles performed a radio show about a purported Martian invasion of Earth and that many people believed it to be true until a few days after the performance. However, they soon realized that it was a hoax based upon facts that they learned or experienced after the radio broadcast.
[4] The "substantial impairment" standard applies to reverse-Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 738-39, 112 S.Ct. 2222, 2234-35, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Supreme Court reasoned that any prospective juror who automatically votes for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id.
[5] The defendant used his second peremptory challenge to remove John Johnson based on his inclination to impose the death penalty upon conviction for first degree murder.
[6] The defendant used his fifth peremptory challenge to remove Harer from the jury based on his inclination to impose the death penalty upon conviction for first degree murder.