# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-251


**STATE OF LOUISIANA**

**VERSUS**

**TREVONTE LAMARQUE TALBERT**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. CR-323-18-1
HONORABLE CRAIG STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, John E. Conery, and Sharon D. Wilson, Judges.


**AFFIRMED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Trevonte Lamarque Talbert**

**Michael Cade Cassidy**
**Thirty-First Judicial District Attorney**
**Robert Leyton Odinet**
**Assistant District Attorney**
**P. O. Box 1388**
**Jennings, LA 70546**
**(337) 824-1893**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GREMILLION, Judge.**

Defendant/appellant, Trevonté Lamarque Talbert, appeals his conviction by unanimous jury verdict of the offense of second degree murder, and violation of La.R.S. 14:30.1.  For the reasons that follow, we affirm.

**FACTS[1]**

Around midnight on January 21, 2018, Brenella Simon was awakened in her Welsh, Louisiana, home by the sound of gunfire that intensified as it grew closer. After the shooting stopped, Ms. Simon discovered at the foot of her steps leading from her carport the body of Nehemiah Gray, who had been shot several times.

Another witness, Kadasja Goodwin, also heard the gunfire, which she could discern from the reports originated from two different guns.  She witnessed a figure dressed all in black run past her door.  Ms. Goodwin stated that she saw that figure's shadow advance across her neighbor's yard.

Following the shooting, Detective Matt Doucet of the Welsh Police Department received a call from other officers about a suspicious vehicle.  He pulled over a vehicle driven by Tanya Tyler, whom he arrested for driving under suspension. Vancourtlan Wiltz and Defendant, who were in the car with Ms. Tyler, filled out information cards and were allowed to leave.

Detective Terry Guillory with the Welsh Police Department was the lead investigator on the case.  He conducted several interviews with at least fifteen witnesses and suspects; one suspect was Nicholas Anderson, who initially denied any involvement in the crime.  However, after Detective Guillory falsely told Mr. Anderson that Defendant confessed to the shooting, Mr. Anderson told Detective Guillory that an unidentified black male accompanied Defendant during the shooting

---

[1] The recitation of facts was derived from testimony at trial.

while Mr. Anderson remained in the vehicle. Mr. Anderson denied knowing what the two had planned and testified that he did not see any guns until after the shooting. He later admitted lying to Detective Guillory to protect a friend, T.J. Williams, who Anderson later admitted was the man who accompanied Defendant.

The Chief of Police for Welsh, Marcus Crochet, took Mr. Anderson for a ride along the route that Mr. Anderson had driven that evening. Mr. Crochet learned that Mr. Anderson picked Mr. Williams up in Welsh. Chief Crochet and Detective Guillory determined that Mr. Anderson lied about some of the information given during the ride. Detective Guillory interviewed Mr. Anderson again. During this interview, Mr. Anderson identified Mr. Williams as the third individual in the car.

The State filed a bill or information on May 1, 2018 charging Defendant with second degree murder. Defendant pleaded not guilty to the charge and requested trial by jury. The case proceeded to trial, and, on March 21, 2019, a jury unanimously convicted Defendant of second degree murder. This appeal follows the granting of Defendant's post-conviction relief application requesting that he be allowed to appeal beyond the delays provided by law. Defendant asserts four assignments or error: the sufficiency of the evidence; the trial court's refusal to exclude a recorded phone call made from the Jefferson Davis Parish jail; the trial court's refusal to instruct the jury that it should consider Mr. Anderson's testimony with great caution; and that his trial counsel rendered ineffective assistance at trial.

## ANALYSIS

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. On April 29, 2019, after Defendant was convicted but before he was sentenced, Defendant filed an "Application for Appointment of Sanity Commission [sic] to Examine Defendant and to Report on

Mental Condition at the Time of the Alleged Offense, and for a Hearing as to His Present Capacity to Proceed." In the body of the motion, defense counsel asserted:

> There is a good reason to believe that at the time of the alleged offense that the defendant was in the midst of a mental health episode as gleamed [sic] from the purported behavior of the defendant.

Although the body of the motion states nothing regarding Defendant's competency to proceed, Defendant's prayer requested that a sanity commission be appointed to evaluate Defendant's present capacity to proceed and evaluate Defendant's mental condition at the time of the offense. On the order attached to the motion is the handwritten word "denied" as well as the trial court's signature dated April 29, 2019.

Since April 29, 2019 is the same date of sentencing and since there is no indication as to the time at which the trial court signed the order, it is not clear whether the trial court denied the motion before it sentenced Defendant. At the beginning of the sentencing hearing, the trial court noted that Defendant was scheduled for sentencing, to which defense counsel responded, "We're prepared to proceed, Your Honor." When asked if he had anything he wished to add to the sentencing, defense counsel replied, "Nothing at this time, sir." The trial court then recited the factors it considered in imposing sentence and sentenced Defendant to the mandatory sentence of life in the Department of Corrections without benefit of probation, parole, or suspension of sentence. Addressing defense counsel, the trial court stated:

THE COURT:

> Now, Mr. Guillory, you had filed a motion for sanity commission.

MR. GUILLORY:

> Yes, sir.

THE COURT:

I have it in my record. I'm denying that motion. Thank you.

MR. GUILLORY:

Thank you, sir.

Louisiana Code of Criminal Procedure Article 643 states:

The court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed. Prior to the ordering of any such mental examination, the court shall appoint counsel to represent the defendant if he has not already retained counsel.

Louisiana Code of Criminal Procedure Article 642 states:

The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.

In the present case, the trial court failed to decide whether a sanity commission should be appointed before proceeding with sentencing. When faced with a similar situation, this court stated the following:

The appointment of a sanity commission is only required when the trial court finds that there are reasonable grounds to doubt the mental capacity of a defendant to proceed to trial. La.Code Crim.P. art. 643. In *State v. Normand*, 04-840, pp. 3-4 (La.App. 3 Cir. 12/15/04), 896 So.2d 98, 100, *writ denied*, 05-231 (La. 5/6/05), 901 So.2d 1094, this court stated as follows:

The appointment of a sanity commission "is not a perfunctory matter or a ministerial duty of the trial court nor is it guaranteed to every accused in every case." *State v. Nix*, 327 So.2d 301, 323 (La.1975); *State v. Sepulvado*, 93-2692 (La. 4/8/96), 672 So.2d 158. The burden of proof lies with the defendant. The defendant must show "by a clear preponderance of the evidence reasonable grounds for the trial judge to believe he is mentally deficient." *State v. Cyriak*, 96-661, p. 8 (La.App. 3 Cir. 11/6/96), 684 So.2d 42, 47. Moreover, "[t]he fact that the defendant's capacity to proceed is called into question does not, for that reason alone, require the trial court to order a mental examination of the defendant." *State v. Lott*, 574 So.2d 417, 424 [ ( ]La.App. 2 Cir.), *writ denied*, 580 So.2d 666 (La.1991), *affirmed after remand,* 27,849 (La.App. 2 Cir. 4/3/96), 671

4

So.2d 1182. The trial court has great discretion in ruling on a determination of competency, and its decision will not be overturned on appeal absent an abuse of discretion. *State v. Comeaux*, 514 So.2d 84 (La.1987); *State v. Lowenfield*, 495 So.2d 1245 (La.1985).

We find that the trial court erred in failing to specifically rule on the defendant's January 22, 2013 motion to appoint a sanity commission contesting the defendant's capacity to proceed before allowing counsel to withdraw the motion.

In *State v. Tyler*, 11-1123 (La.App. 3 Cir. 5/9/12), 89 So.3d 510, *writ denied*, 12-1314 (La. 11/30/12), 103 So.3d 364, the defendant claimed on appeal that the trial court erred in allowing defense counsel to withdraw a motion to appoint a sanity commission as it was a prohibited step in furtherance of the prosecution. The trial court had signed an order appointing a sanity commission, but the defendant had not yet been examined. Although the contradictory hearing on the motion was scheduled, the motion to request a sanity commission was withdrawn by defense counsel. This court found merit to the defendant's claim, stating:

> Louisiana Code of Criminal Procedure Article 643 requires the trial court order a mental examination of Defendant when it has reasonable ground to doubt Defendant's mental capacity to proceed. Louisiana Code of Criminal Procedure Article 644 requires the court appoint a sanity commission to examine and report on the mental condition of Defendant within seven days after a mental examination is ordered. The examination was ordered in the present case, indicating the trial court found reasonable ground to doubt Defendant's capacity to proceed. *See State v. Strain*, 42,809 (La.App. 2 Cir. 12/5/07), 972 So.2d 1184, and *State v. Nomey*, 613 So.2d 157 (La. 1993). Withdrawal of a motion to appoint a sanity commission has been found to be a further step in the prosecution which improperly removes the ultimate decision of competency from the trial court. *State v. Carney*, 25,518 (La.App. 2 Cir. 10/13/95), 663 So.2d 470, *Strain*, 972 So.2d 1184, *State v. Darnell*, 43,048 (La.App. 2 Cir. 8/13/08), 988 So.2d 870. Thus, we find allowing the case to move forward in the absence of a determination that Defendant had the capacity to proceed was legal error.

*Id.* at 513-14.

Unlike the facts in *Tyler*, the trial court here had not yet appointed a sanity commission, and thus had not yet ruled on whether the defendant had presented reasonable grounds to doubt his mental capacity to proceed. It is further noted that the basis for the initial motion for a sanity commission was a broad, non-specific assertion that

5

the defendant showed "characteristics of having a mental disorder[,]" which were observed by defense counsel's investigator. Accordingly, the question becomes whether the trial court should have determined whether the defendant was competent to proceed or whether his request for the sanity commission was without merit, rather than simply permitting defense counsel to withdraw the motion outside of the presence of the defendant.

In *State v. Carney*, 25,518, pp. 4-5 (La.App. 2 Cir. 10/13/95), 663 So.2d 470, the court, in addressing the trial court's role relative to issues of a defendant's capacity to proceed, stated the following:

> "Due process and our statutory law require that the issue of the defendant's mental capacity to proceed shall be determined by the court." [*State v.*] *Rogers*, [419 So.2d 840, 843 (La. 1982)]. "This cardinal principle . . . prohibits [the court] from committing the ultimate decision of competency to a physician or anyone else." *Id.* Furthermore, the above articles, when read in pari materia, implicitly require the trial court to rule on the defendant's motion and determine whether a "reasonable ground to doubt the defendant's mental capacity" exists before proceeding further in the prosecution. Withdrawing a motion to appoint a sanity commission is a further step in the prosecution. Also, permitting such a motion to be withdrawn takes the ultimate decision of competency away from the court. Thus, although a mental examination may not be required in every case where the issue of mental capacity is raised, *State v. Wilkerson,* 403 So.2d 652 (La. 1981); *State v. Folse*, 623 So.2d 59 (La.App. 1st Cir. 1993), the record must reflect that the trial court made a determination of whether or not reasonable grounds exist to doubt the defendant's capacity to proceed.

After finding that the defendant had sufficiently raised the issue of his capacity to proceed following his indictment, the court, in reversing the defendant's conviction, stated as follows:

> After the defendant raised the issue, the trial court allowed further steps in the prosecution to occur without making a determination of the defendant's mental capacity to proceed to trial. When defense counsel withdrew the motion to appoint a sanity commission, the defendant was not present and the trial court did not observe or question him about his mental capacity. At the very least, the record should reflect that the trial court should have personally observed the defendant and questioned him as to his understanding of the proceedings to determine if a "reasonable ground" existed to doubt his mental capacity. Further, as noted by the United States Supreme Court, it is contradictory to argue that a defendant may be mentally

6

incompetent, and yet he may knowingly or intelligently waive his right to have the court determine his mental capacity to stand trial. *Pate* [*v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) ], *State v. Harris*, 406 So.2d 128 (La. 1981).

Once a motion to appoint a sanity commission has been made, it takes on a life of its own as nothing further can happen without resolving the issue of the defendant's mental capacity. An attorney independently waiving or withdrawing the motion is an insufficient resolution of the issue. The trial court, not the defense attorney, is mandated to determine the defendant's mental capacity to proceed and rule on the motion. LSA–C.Cr.P. Arts. 642 and 643.

*Id.* at 473.

Accordingly, we find that the trial court erred in allowing the withdrawal of the defendant's motion to appoint a sanity commission without first specifically ruling on the motion. However, unlike in *Carney*, we find that the trial court specifically considered the issue when it denied a similar motion contesting the defendant's capacity, which was later filed by the defendant's wife, allegedly on his behalf.

. . . .

Accordingly, while we conclude that it was error for the trial court to allow defense counsel to withdraw the motion to appoint a sanity commission at the hearing on January 22, 2013, we find that error to be harmless in light of the trial court's denial of the August 11, 2015 motion for a sanity commission. Given this ruling, together with the overwhelming evidence in support thereof, we find that there can be no doubt that the defendant was competent during the entirety of these proceedings. Therefore, while this court concedes the error of the trial court, we find this to be a harmless error in light of the trial court's subsequent actions.

*State v. Duhon*, 17-19, pp. 3-9 (La.App. 3 Cir. 6/13/17), 224 So.3d 1, 3-7, *writ denied*, 17-1278 (La. 4/27/18), 239 So.3d 835.

In *State v. Thibodeaux*, 08-1011, p. 4 (La.App. 1 Cir. 10/31/08) (unpublished opinion),[2] *writ denied*, 08-2819 (La. 10/9/09), 19 So.3d 7, the trial court's failure to rule on the defendant's competency was found to be harmless error:

The record does not reflect that the trial court made a formal ruling, following a contradictory hearing, that the defendant had the

---

[2]This case is cited at 2008 WL 4763732.

7

capacity to proceed prior to sentencing. *See* La.C.Cr.P. arts. 642 and 647; *State ex rel. Seals v. State,* 00–2738, p. 5 (La.10/25/02), 831 So.2d 828, 832–33. Although the failure to rule on the defendant's capacity is error under La.C.Cr.P. art. 920(2), it certainly is not inherently prejudicial to the defendant in this case. The defendant only moved for appointment of a sanity commission after pleading guilty, indicating there was no serious issue of capacity in this case. The court then appointed the sanity commission "out of an abundance of caution." Further, the record has been supplemented with the reports of the doctors on the sanity commission, and all of the doctors found the defendant to be competent to proceed. Additionally, the defense abandoned the issue, if any, of the defendant's competency by failing to seek an examination from "a third doctor." Because the trial court's failure to rule on the defendant's capacity was not raised by either the defense or the state in either the trial court or on appeal and because the error is not inherently prejudicial, we are not required to take any action. As such, we decline to remand for a *nunc pro tunc* hearing on the issue of competency to correct this error in accordance with *State ex rel. Seals,* 00-2738 at pp. 6-7, 831 So.2d at 833. *See State v. Price,* 05-2514, pp. 18-22 (La.App. 1st Cir.12/28/06), 952 So.2d 112, 123-25 (en banc), *writ denied,* 07–0130 (La.2/22/08), 976 So.2d 1277.

Finally, in *State v. Kelly*, 95-1663 (La.App. 3 Cir. 5/8/96), 677 So.2d 495, this court held that it was patent error to arraign the defendant after he raised the issue of mental incapacity but before a determination was made as to his competency to proceed to trial. This court found the lack of a contemporaneous objection resulted in a waiver of the error and rendered the error patent harmless.

As in the cases discussed above, we find that the trial court's failure to specifically rule on Defendant's motion to appoint a sanity commission prior to sentencing Defendant was harmless. As stated previously, the body of the motion alleged incapacity at the time of the offense but stated nothing regarding Defendant's competency to proceed. Defense counsel raised no objection to the trial court proceeding to sentencing without ruling on the motion nor has any issue or allegation of prejudice been raised on appeal. The trial court imposed the mandatory sentence of life imprisonment and then immediately denied the motion to appoint sanity commission, again with no objection by defense counsel. Additionally, Defendant

8

does not challenge the sentence imposed on appeal. Consequently, the error is considered harmless.

*Assignment of error number 1*:

In his first assignment of error, Defendant argues that the evidence introduced at trial, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, (1979) standard, was insufficient to prove beyond a reasonable doubt that he was guilty of the second degree murder of Nehemiah Gray. In the other assignments of error, Defendant challenges the admission of evidence and other trial errors. When the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The rationale is that when the entirety of the evidence is insufficient to support a defendant's conviction, the defendant must be discharged as to that crime, and any other issues become moot. *State v. Hearold*, 603 So.2d 731 (La.1992). Accordingly, we will address the sufficiency of the evidence first.

The standard of review in a case of identification is well-established:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297; *State v. Neal*, 00-0674 (La. 6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State v. Bright*, 98-0398, p. 22 (La. 4/11/00), 776 So.2d 1134, 1147.

*State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051 (alteration in original).

In addition to the testimony discussed above, the State called several witnesses at trial. Officer Kristina Davy testified that affidavits and search warrants were obtained for cell phone records of persons including Mr. Williams and Defendant,[3] which were sent by AT&T on January 28, 2018 and by Verizon on February 20, 2018, respectively. Over defense counsel's objection, the court accepted former detective with the Jennings Police Department, Richard Geiger, as an expert in cellphone technology and forensic data recovery. Mr. Geiger testified that he examined the cellphone records obtained from the providers and examined phone calls that occurred close in time to the murder of the victim. He determined that Defendant's last communication before the midnight shooting was at 11:25 p.m.; it lasted one minute and thirteen seconds and was placed from Defendant's phone to a number belonging to Zerick Shepard. Mr. Geiger further determined that the call was made within the Welsh tower on side three of the tower. The same number that received a call from Defendant at 11:25 p.m. called Defendant at 12:16 a.m. and lasted one minute and sixteen seconds; this call started on a tower located north of Lacassine and south of Fenton and ended on the Welsh tower. Mr. Geiger also testified that he observed calls made before 11:25 p.m. on January 21, 2018, and after 12:16 a.m. on January 22, 2018, and determined that the information he obtained was consistent with the route outlined on the maps drawn by witnesses, Mr. Anderson and Mr. Crochet, regarding the route Mr. Anderson drove on the night in question. Through his investigation, Mr. Geiger found a text message sent on

---

[3]Richard Brown testified to this fact as well.

10

January 20, 2018, between the phone number registered to Defendant and Mr. Dallas Simon that read, "I'm suited in my gear with that XD ready."

Over the defense's objection, the State called the Warden of Jefferson Davis Parish jail, Dustin Locke, who testified that Defendant's "pin number"[4] was used to make two calls on March 18, 2019. The state introduced a recording of the call into evidence and played it for the jury; the caller advised the person to contact T2 and Superbad to "fix the problem."[5] Defendant later testified that he was aware that the conversation was being recorded, that he was not threatening anyone, and that he was contacting the person to convince their cousins not to lie while testifying at trial.

When the State called Zerick Shepard, he testified that he knew the victim and learned of his death immediately because he lived a block away from where the victim was murdered. He testified that he went to the crime scene after hearing the gunshots. While at the crime scene, Mr. Shepard received a call from Defendant asking who had been shot; Mr. Shepard told Defendant that he did not know what was going on and that he would call him back.

Dr. Terry Welke, a forensic pathologist, testified that Mr. Gray's death was caused by multiple gunshot wounds to the head, trunk, and left upper and lower extremities. Dr. Welke further testified that, of the five bullet wounds, three were medium caliber bullets which were in the range of a ".3 something or a 9 millimeter" from Mr. Gray's head and trunk; the bullet holes in Mr. Gray's legs were more consistent with a "higher velocity-type weapon."

Kristina Davys, the Evidence Custodian with the Welsh Police Department, testified that twelve .223 spent cartridges, twelve .45 spent cartridges, and one .40

---

[4]Mr. Locke testified that a pin number is assigned to an inmate and used when the inmate makes a call.

[5]When Defendant testified, he explained that T2 and Superbad are brothers, and both are first cousins of Mr. Anderson.

spent cartridge were found at the crime scene. Officer Davy further testified that there were no fingerprint or DNA evidence linking Defendant to the crime or recovered casings.

Kristi Ellington, an expert in firearms analysis, testified that she received several items for testing, including eleven .45 Auto caliber cartridge cases, twelve 5.56 NATO caliber cartridge cases, three bullets, two bullet jackets that were .45 caliber, two lead round nose bullets, and a bullet jacket that was either a .223 Rem or a 5.56 caliber. Ms. Ellington explained the similarities and differences between a .223 caliber and a 5.56 caliber, describing the .223 caliber as a commercial round and a 5.56 as a military round. She opined that based on the identification marks shown on the casings, the bullets had the same class-characteristics consistent with a .45 caliber included in those manufactured by Llama and Ruger but admitted that they could belong to others as well, including the Springfield XD. The identification marks found on the .556 bullets appeared to Ms. Ellington to be fired from a semiautomatic rifle such as an AR-15. Ms. Ellington also mentioned that while black is the most common color for AR-15s, they also are painted camouflage.

Mr. Anderson testified that on January 21, 2018, he went to his aunt's house to work on a storage building and socialize with relatives and friends, including co-defendant, T. J. Williams, IV, and a friend of the family, Defendant. Mr. Anderson agreed to drop Defendant off at Defendant's home in Welsh to make some gas money. When Mr. Anderson, Mr. Williams, and Defendant arrived at Defendant's mother's house, Defendant ran inside and changed his outfit from a white t-shirt and khaki pants to all black attire, and Mr. Anderson noticed that Defendant had a revolver. After leaving Defendant's home, Defendant directed Mr. Anderson to pull up beside a church, where Defendant got out of the car, ran to some bushes, and returned to the vehicle with a black handgun and a big rifle. Mr. Anderson described

12

the handgun as a normal cop gun without a cylinder; he described the rifle as a camouflaged AR-15. Mr. Anderson testified that he did not handle any guns, but Defendant handled the AR-15, and Mr. Williams handled the other two guns.

Defendant then instructed Mr. Anderson to back in next to a daycare and wait for him and Mr. Williams to return. Mr. Anderson heard ten or fifteen rapid-fire gunshots approximately ten minutes after Defendant and Mr. Williams left him; thirty seconds later, he heard two more faint shots. Five minutes later, Mr. Williams and Defendant returned to the vehicle sweating, and Mr. Anderson was instructed to drive off. Mr. Williams and Defendant were dropped off on Orange Street after Defendant guided Mr. Anderson through a gravel road and across I-10. Mr. Anderson then returned to his home in Lafayette. Mr. Anderson further testified that Defendant received a call and made a call after the shooting while they were on the gravel road and that he heard Mr. Williams state that he ran out of bullets and that "you" had to finish the job.

Vancourtlan Wiltz testified that Defendant had called Ms. Tyler asking for a ride to his home. She drove Mr. Wiltz to Defendant's location, a store named "Cap's" in Jennings. Mr. Wiltz noticed that Defendant was carrying a Springfield XD .45 pistol. He had seen Defendant in possession of this pistol before.

Defendant also took the stand and testified that he went home on January 21, 2018, between 9:00 p.m. and 10:00 p.m. in Welsh after spending the day in Jennings at "the studio." After Mr. Williams called Defendant inquiring about whether he knew where Jermaine Washington stayed, Mr. Anderson, Mr. Williams, and a third male that Defendant did not know picked Defendant up from his mother's home and pointed out Washington's residence as they drove by, which was later identified as Kadasja Goodwin's residence. When Anderson parked near the daycare center, Defendant testified, Mr. Anderson, Mr. Williams, and the unfamiliar male got out

13

and told Defendant they would be back in a few minutes. Defendant heard gunshots ten to fifteen minutes later, and the three males returned to the vehicle and asked him for a get-away route; he provided directions. Defendant further testified that when they returned to the vehicle, the unfamiliar man had an assault rifle, Mr. Williams had a .45 caliber, and Mr. Anderson had a revolver. Defendant made a phone call to Mr. Shepard as they were leaving to find out what happened. Defendant testified that Mr. Anderson drove to the studio in Jennings, and he and Mr. Williams hung out with others while Mr. Anderson and the unfamiliar male left.

Defendant denied texting or knowing Dallas Simon; he testified that Mr. Williams borrowed his phone a couple of days before while they were at the studio. Defendant stated that Mr. Williams did not always have a phone with him. Defendant denied owning a gun in January 2018, shooting Gray, receiving instructions from Mr. Williams to put the final shots in the victim's head, firing shots at Gray in the yard of the Goodwin and Simons' homes, firing any shots, or wearing all black on the night of January 21, 2018. Defendant testified that he did now know that the men intended to commit a homicide and admitted to telling officers when he was initially questioned that he was not in Welsh nor did he go to his mother's house on the night of the murder. At trial, though, he testified that his mother, father, and siblings could confirm that he was home and Anderson later picked him up from the residence.

The State recalled Mr. Geiger, who testified that he checked the call log on Defendant's cellphone for the hours before the murder and determined that a call reported at 10:34 p.m. still reported on the Jennings tower. Four minutes later, at 10:38 p.m., a call reported on the Welsh tower on the side within the area of Defendant's home. Several calls between 10:38 p.m. and 11:25 p.m. placed

14

Defendant on the Welsh tower and on Side 2.[6] Mr. Geiger testified that he did not find any calls from Mr. Williams's phone with the Welsh tower and Side 2 listed and concluded there was no call to Defendant's phone from Mr. Williams between 8:00 p.m. and 10:00 p.m. on January 21, 2018. Mr. Geiger further testified that several hours before the murder, between 6:22 p.m. and 6:30 p.m., five attempts were made from Defendant's phone to the cellphone number listed for Dallas Simon. Over the course of one year, there were 101 communications between Defendant's number and Mr. Simon's number. After testifying that there were no communications found during the same time frame between Mr. Williams' cellphone number and Mr. Simon's number, Mr. Geiger concluded that Defendant was in the Jennings area from 8:00 p.m. to 10:00 p.m. on January 21, 2018, and from 10:00 p.m. to 11:00 p.m., he was in Welsh. Mr. Geiger mentioned that there were incoming calls to Defendant's phone between 8:00 p.m. and 11:00 p.m., but he did not indicate how many.

Defendant argues that the verdict was contrary to the law and the evidence, because, except for the testimony of the co-defendant, the case consists of only circumstantial evidence. Defendant further contends that the physical evidence admitted at trial did not identify anyone as a participant in the crime. Citing *State v. Neal*, 00-0674 (La. 6/29/01), 796 So.2d 649, Defendant argues that there was no evidence admitted at trial sufficient to prove Defendant planned the shooting of the victim nor is there any evidence that demonstrates he was involved in the murder of the victim.

We find that the evidence was sufficient to convict Defendant of the murder of the victim. The jury heard the testimony of Mr. Anderson, who identified

---

[6]"Side 2" is by the family residence at 615 Naebers Street.

15

Defendant as one of the people involved in the victim's murder. Nicholas Anderson testified that he agreed to bring Defendant home after they spent a day at the "studio." He further testified that Defendant went inside of his home, and when he came out, he was wearing all black and carrying a revolver. After directing Mr. Anderson to pull up beside a church, Defendant exited the vehicle, ran to some bushes, and returned to the vehicle with a black handgun and a camouflaged rifle. Defendant then instructed Mr. Anderson to park near a daycare and to wait for him and co-defendant Williams to return. Mr. Anderson heard rapid gunshots about fifteen minutes later; he heard two faint shots thirty seconds after that. Defendant and Mr. Williams returned to the vehicle sweating, and Defendant instructed Mr. Anderson to leave.

The jury was able to weigh this evidence against Defendant's testimony. In making this credibility determination, the jury also had the benefit of the following circumstantial evidence connecting Defendant to the shooting: evidence found at the crime scene and analyzed by investigators, detectives, and police; the victim's bullet wounds, which matched the types of guns Mr. Anderson witnessed Defendant with; and cell phone analyst expert testimony that indicated Defendant was in the vicinity where the crime occurred. Further, shell casings at the scene matched the caliber of the gun Mr. Wiltz saw in Defendant's possession, the possession of which Defendant denied. This gun coincides with the model identified in the text message sent from Defendant's phone to Mr. Simon's phone on January 20, 2018.

This court has stated the following regarding a jury's rejection of a defendant's hypothesis of innocence:

> With respect to a jury's rejection of a hypothesis of innocence, our supreme court in [*State v.*] *Calloway*, [07-2306 (La. 1/21/09),] 1 So.3d [417] at 422 (citations omitted), concluded:

> [W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'"

> The jury's decision to reject the defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned.

*State v. Jackson*, 14-9, pp. 12-13 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639 (fourth alteration in original), *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066.

Likewise, the jury's rejection of the Defendant's hypothesis of innocence in the present case was based upon its rational credibility and evidentiary determinations. Defendant denied that he was involved in the shooting. During his closing, Defendant's defense counsel argued that the only witness who identified Defendant as the person who committed the murder of the victim was "ole' lying Nick."; that no guns, fingerprints, or DNA evidence proved that Defendant was responsible for Mr. Gray's murder; that Defendant did not know who got shot, and he was trying to get some information when he called State's witness, Zerick Shepard; that the telephone records indicate that Defendant was at his home at the time of the shooting; that Defendant was afraid to inquire about what the others were doing with the guns and where they were going; and that something was "fishy,"

17

indicating that the other two defendants suspected of committing the murder were "trying to plead out, save themselves, tell some lies[.]"

The jury heard these hypotheses of innocence and obviously rejected them. Considering the testimony that Defendant was named as one of the shooters along with the circumstantial evidence linking Defendant to the shooting, the jury's rejection of these hypotheses of innocence was reasonable. Accordingly, the evidence was sufficient to convict Defendant, and this assignment of error lacks merit.

*Assignment of error number two*:

Defendant asserts the trial court erred in permitting the introduction of a phone recording Defendant made from the parish jail on March 18, 2019. Defendant argues that nothing in this case rises to the level of showing an awareness of consciousness of guilt on the part of Defendant, and the admission of the phone call was highly prejudicial. Although La.Code Crim.P. art. 768 required the State to disclose any inculpatory statements before opening statements, we find that an analysis of whether notice was adequate is unnecessary, because in the event any error occurred, it was harmless.

In *State v. Thibodeaux*, 16-542, p. 9 (La.App. 3 Cir. 3/15/17), 216 So.3d 73, 81, *writ denied*, 17-672 (La. 12/5/17), 231 So.3d 628, this court held:

> The State's failure to provide adequate notice of intent to introduce inculpatory statements is subject to a harmless error analysis. *See State v. Quimby*, 419 So.2d 951 (La.1982). Specifically, "the error may be harmless if the remaining evidence of guilt is overwhelming." *Id.* at 958. *See also State v. Curington*, 09–867, (La.App. 5 Cir. 10/26/10), 51 So.3d 764, *writ denied*, 10-2612 (La. 4/8/11), 61 So.3d 684.

Likewise, due to the overwhelming evidence of Defendant's guilt, as discussed in the previous assignment of error, we find that any error that may have occurred was harmless. Therefore, this assignment of error lacks merit.

18

*Assignment of error number three*:

In his third assignment of error, Defendant argues that the trial court erred in failing to instruct the jury to treat the testimony of the co-defendant with "great caution." Defendant also asserts that he was ultimately deprived of a fair trial when the trial court failed to instruct the jury as to the State's burden of proof when the defense raised the issue of misidentification. The trial court instructed the jurors, in pertinent part, as follows:

> As jurors, you alone determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony and the circumstances under which the witness has testified. In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified; his or her manner while testifying; any reason he or she may have for testifying in favor of or against the state or the defendant, and the extent to which the testimony is supported or contradicted by other evidence.

The "great caution" instruction advises the jurors that they should accept the testimony of a codefendant with great caution, suspicion, or distrust when the codefendant provides evidence in exchange for personal advantage. However, the "great caution" instruction is not required when the codefendant's testimony is corroborated by surrounding circumstances. *State v. Fontenot*, 16-226 (La.App. 3 Cir. 11/2/16), 207 So.3d 589. The evidence discussed above materially corroborated Mr. Anderson's testimony.

Here, the issue of misidentification hinged on the jury's acceptance of Mr. Anderson's testimony. In *Fontenot*, we held that such an instruction is not required when the facts do not demonstrate that witnesses may have "mistakenly identified the Defendant as the perpetrator." *Id*. at 609. Therefore, this assignment lacks merit.

19

*Assignment or error number 4*:

Defendant contends that his trial attorney failed to render effective assistance at trial because he did not object to the trial court's failure to instruct the jury on the "great caution" issue and on the issue of misidentification. Because we have held that the instructions were not required, we find that this assignment of error lacks merit.

## DECREE

For the reasons stated above, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**